UNITED STATES *v.* DALLES MILITARY ROAD CO.

UNITED STATES *v.* OREGON CENTRAL MILITARY ROAD CO.

UNITED STATES *v.* WILLAMETTE VALLEY AND CASCADE MOUNTAIN WAGON ROAD CO.

UNITED STATES *v.* KELLY.

UNITED STATES *v.* COOPER.

UNITED STATES *v.* ROGERS.

UNITED STATES *v.* GRANT.

UNITED STATES *v.* FLOYD.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

Nos. 1218, 1219, 1248, 1444 to 1448. Argued March 6, 9, 1891.—Decided May 25, 1891.

In suits in equity brought by the United States under the act of Congress passed March 2, 1889, (25 Stat. 850,) against corporations and persons claiming to own lands granted to the State of Oregon by the acts of

Congress of July 2, 1864, (13 Stat. 355,) July 5, 1866, (14 Stat. 89.) and February 25, 1867, (14 Stat. 409,) to declare the lands to be forfeited to the United States, and to set aside, for fraud, patents granted therefor, the defendants pleaded the issuing of certificates by the governor without fraud committed upon or by him; that they were *bona fide* purchasers, for a valuable consideration, without notice; and that they had expended moneys in respect of the lands in good faith. The pleas having been set down for hearing, the Circuit Court sustained them and dismissed the bills, without permitting the plaintiffs to reply to the pleas: *Held*, that they ought to have been allowed to take issue on the pleas.

The act of 1889 intended a full legal investigation of the facts, and did not intend that the interests involved should be determined on the untested allegations of the defendants.

The claims of the United States cannot be treated as stale claims, nor can the defences of stale claim and laches be set up against them.

Other bills were dismissed on general demurrers, after the bills were dismissed on the hearing on the pleas, and, as it appeared that the disposition of the pleas was regarded as determining all the suits, the decrees in all of them were reversed.

THE facts which make the case in each of these cases are stated in the opinion, in connection with that particular case, so completely that it is not necessary, nor would it be proper to repeat them. Different counsel represented different parties at the argument and their arguments necessarily travelled over somewhat the same ground. In the case in which argument is reported, the facts will be found in the opinion upon The Willamette Valley Case, *post*, 622.

*Mr. Assistant Attorney General Parker* for the United States in all the cases.

*Mr. James K. Kelly* for the Dalles Military Road Company, the Eastern Oregon Land Company, Kelly, Thornbury and others.

*Mr. Rufus Mallory* for the California and Oregon Land Company.

*Mr. John E. Parsons* and *Mr. C. E. S. Wood* for the Willamette Valley and Cascade Mountain Wagon Road Company.

I. When the government of the United States becomes a suitor, it submits itself to such principles of justice and rules of equity as apply between ordinary suitors.

The act of 1889, under which the bill was filed, provides in so many words that the suit "shall be tried and adjudicated in like manner and by the same principles and rules of jurisprudence as other suits in equity are tried."

It does not require such an express enactment to deprive the government of special immunities when it sees fit to accept the jurisdiction of its own courts. That it may not be sued without its permission involves grave considerations of public policy. When, however, it sees fit to waive its privilege, and as a suitor to come before its courts, more particularly before a court of equity, its rights and liabilities are to be determined by the same standard which applies in any case. *United States* v. *Arredondo*, 6 Pet. 691; *United States* v. *Ringgold*, 8 Pet. 150; *United States* v. *Macdaniel*, 7 Pet. 1; *United States* v. *Barker*, 12 Wheat. 559; *United States* v. *Bostwick*, 94 U. S. 53; *United States* v. *Smith*, 94 U. S. 214; *Osborn* v. *Bank of the United States*, 9 Wheat. 738; *Mitchel* v. *United States*, 9 Pet. 711; *Manufacturing Co.* v. *United States*, 17 Wall. 592; *The St. Jago de Cuba*, 9 Wheat. 409; *The Siren*, 7 Wall. 152.

II. The act of July 5, 1866, constituted a grant *in præsenti.*

The provision that if the wagon road contemplated "is not completed within five years no further sales shall be made, and the lands remaining unsold shall revert to the United States," is in the nature of a condition subsequent. To create a forfeiture required affirmative action by Congress and suit instituted.

The language of the act is, "that there be and hereby is granted to the State of Oregon." Upon this subject the law is correctly stated by Judge Deady. As soon as the line of road was designated, the grant attached to the odd numbered sections, within the prescribed limits, on either side of said line, and took effect from the date thereof. *Schulenberg* v. *Harriman*, 21 Wall. 44; *Missouri, Kansas &c. Railway* v. *Kansas Pacific Railway*, 97 U. S. 491; *Van Wyck* v. *Knevals*, 106 U. S. 360. No one except the grantor could enforce the

forfeiture. Assuming the right to forfeit to exist — if it were not exercised, or if an attempt to exercise it was unduly delayed, the title remains unimpaired in the grantee. *Schulenberg* v. *Harriman,* 21 Wall. 44.

III. By the allegations of the bill it appeared both that the demand was what is known in equity as stale, and that the government was chargeable with laches. For that reason the bill was properly dismissed.

The law about the staleness of claims is well settled. Somewhat running in the same lines is the application to this case of the doctrine of *laches.* Our claim is that any right of forfeiture is barred, both because the claim is stale and because of laches.

It is something more than mere negative action in which the laches consists. It is in the omission by the government to do what in the interest of protecting subsequent purchasers good conscience required that it should do, and in its affirmative action in recognizing that no equitable claim to a forfeiture existed.

We understand stale demands to be distinguished from laches in these particulars amongst others, viz. : Laches is mere delay. Stale demand is without necessary analogy to the Statute of Limitations. It may be by analogy the statutory limitation ; it may be a less period. See *United States* v. *Beebe,* 127 U. S. 338 ; *United States* v. *Throckmorton,* 98 U. S. 61 ; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273.

IV. Furthermore, the facts alleged in the bill and the action of the government as shown by the reports of its houses of Congress and the action of its executive officers, create an estoppel which of itself was an answer to the bill.

Estoppel we understand to be radically distinct on principle from either stale demand or laches. Of course, there may be estoppel by mere silence or lapse of time, but we understand the underlying principle to be, when the plaintiff has done some positive act or acquiesced in some positive act so as to assert or seem to assert one thing, and the defendant has depended upon this assertion and altered his position relying upon it, it is inequitable to allow the plaintiff then to assert the contrary

and place the defendant in a worse position ; that is, laches. and stale demand are negative and consist essentially in letting time slip by, while estoppel is affirmative and generally consists in doing some positive act.

As this defence has been clearly and distinctly allowed as. against sovereign States it ought, on principle to be allowed against the national sovereignty. Although there is no case in the Supreme Court which we have found that distinctly asserts the principle, there are many which assume as apparently beyond doubt that the doctrine of estoppel is applicable to the government.

V. The action of the government constituted a waiver of the right of reëntry, and freed the estate from liability to· forfeiture.

It is an incident of an estate liable to be defeated upon a. condition subsequent, that only the grantor is entitled to take· advantage of a failure to perform the condition. He may waive his right of reëntry. The waiver may be either expressed or implied from tacit acquiescence or from some other recognition of the estate freed from the condition. Touchstone, 153 ; Cruise, Title 13, c. 2, sec. 63, *et seq.; Ludlow* v. *N. Y. & Hudson River Railroad,* 12 Barb. 440 ; *Douglas* v. *Union Mut. Ins. Co.,* 127 Illinois, 101. ·That the condition may be waived expressly or *in pais,* see *Davis* v. *Gray,* 16 Wall. 203 ; *Holden* v. *Joy,* 17 Wall. 211 ; *Ludlow* v. *N. Y. & Hudson River R'y,* 12 Barb. 440 ; *Chicago, Rock Island &c. Railway* v. *Grinnell,* 51 Iowa, 476 ; *Hooper* v. *Cummings,* 45. Maine, 359. And waiver· by silence is deemed acquiescence.. *In re N. Y. Elevated Railroad,* 70 N. Y. 327.

There is another rule which follows from the principle that· only the grantor has the right to reënter if the condition is. broken, and that this right may be waived by him; and that·· is that the exercise of this right is necessarily an option. If the right resolve itself into an option on the part of the· grantor, then all the principles of law applicable to options. must be applied here; that is, he must take advantage of it. promptly, and, as many of the courts have held, upon the very instant of the breach. See *Hall & Rawson* v. *Delaplaine,* 5.

Wisconsin, 206; *S. C.* 68 Am. Dec. 57, and *Grigg* v. *Landie*, 6 C. E. Green, 506.

We do not care to contend that the rule in all its strictness should be applied to a sovereign, but we do maintain that, within a reasonable time after acquiring knowledge of the breach, the sovereign is bound to take notice of it, or his silence will be taken as a waiver of this option and acquiescence in the breach. *People* v. *Society &c.*, 2 Paine, 545.

VI. The uncontradicted allegations of the pleas and answers coupled with the statements of the bill show that the respondents are *bona fide* purchasers. For that reason the bill was properly dismissed as to them.

The act of March 2, 1889, under which the bill was filed provides that there shall be saved and reserved "the rights of all *bona fide* purchasers of either of said grants or of any portion of the said grants for a valuable consideration, if any such there be."

The pleas and answers show that the respondents paid originally $182,128.89 for the lands. They are *bona fide* purchasers within the purview of the act.

More for the sake of preserving the authorities than from any real necessity for reference to them, we cite the following cases which sustain the proposition that a grant in present words of grant passes the whole legal title, and that, upon selection and certification of any particular body of land, the title to this land takes effect by relation as of the date of the grant. *Rutherford* v. *Greene*, 2 Wheat. 196; *Wright* v. *Roseberry*, 121 U. S. 488; *United States* v. *Arredondo*, 6 Pet. 691; *United States* v. *Percheman*, 7 Pet. 51; *Mitchel* v. *United States*, 9 Pet. 711; *Ladiga* v. *Rowland*, 2 How. 581; *United States* v. *Brook*, 10 How. 442; *Lessieur* v. *Price*, 12 How. 59; *Fremont* v. *United States*, 17 How. 542; *United States* v. *Reading*, 18 How. 1; *Railroad Co.* v. *Smith*, 9 Wall. 95; *Schulenberg* v. *Harriman*, 21 Wall. 44; *Railroad Land Co.* v. *Courtright*, 21 Wall. 310; *Railroad Company* v. *Baldwin*, 103 U. S. 426; *Grinnell* v. *Railroad Co.*, 103 U. S. 739; *Wood* v. *Railroad Co.*, 104 U. S. 329; *Van Wyck* v. *Knevals*, 106 U. S. 360. These authorities settle the question as to whether

our grantor had the legal title with right to convey. And pertinent to this question also is the act of 1874. The plea recites, and for the purposes of this argument its. recitals are truth, that the defendants Weill and Cahn paid at the time of the purchase nearly $150,000.

We have in our case a union of all the elements above mentioned, and which make up the status of a *bona fide* purchaser.

VII. The act of Congress of June 18th, 1874, is a conclusive and binding adoption by the United States of the governor's certificates as conclusive evidence of the completion of such portions of the road as the certificates cover. The act is a legislative recognition and affirmation of the correctness of the certificates and establishes the defendants' right to patents for all lands covered by the certificates.

The language of the act is that, in all cases where the road in aid of the construction of which said lands were granted " is by the certificate of the governor of the State of Oregon shown as in said acts provided to have been constructed and completed, patents for said lands shall issue in due form to the State of Oregon . . . unless the State of Oregon shall by public act have transferred its interest in said lands to any corporation or corporations," etc.

By this language Congress, with presumed knowledge of all that had happened up to the date of the passage of the act, adopted and ratified the certificates of the governor as conclusive upon the right of the defendants to receive the patents.

VIII. The allegations made by the bill and the questions examined by this court must be limited by the provisions of the act of 1889.

We are reluctant to make any purely technical defences, but as attorneys for the defendants we feel obliged to insist that the Attorney General in bringing the bill can only examine the certain questions permitted by the act. We are well convinced that the Attorney General would have had the right to have filed a full and complete bill without any direction from Congress. That no Attorney General has seen fit to do so is to a certain extent argument that no good cause of suit on behalf of the government existed. When, therefore, Congress under-

takes to direct a suit, we hold that the Attorney General and this court are limited by the provisions of that directing act, both as to the grievances to be stated in the bill and the relief to be sought. *United States* v. *Union Pacific Railway Co.,* 98 U. S. 569, 608; *United States* v. *Arredondo,* 6 Pet. 691, 726.

IX. The decree properly dismissed the bill, no request having been made for leave to take proofs or to go to a hearing upon the facts. The only disposition of the case which could be made by the Circuit Court was to dismiss the bill.

Unless plaintiff undertakes to reply to the plea after it is allowed, if the plea goes to the whole bill, the order allowing it directs dismissal of the bill. 1 Daniell Ch. Pr. 5th ed. p. 698.

Mr. JUSTICE BLATCHFORD delivered the opinion of the court.

No. 1218 was a bill in equity, filed by the Attorney General of the United States, on their behalf, against the Dalles Military Road Company, James K. Kelly, C. N. Thornbury, the Eastern Oregon Land Company and twelve other individual defendants.

The bill sets forth that on the 25th of February, 1867, the Congress of the United States passed, and the President duly approved, an act (14 Stat. 409, c. 77) granting to the State of Oregon, to aid in the construction of a military wagon road from Dalles City on the Columbia River, by way of Camp Watson, Cañon City and Mormon or Humboldt Basin, to a point on Snake River opposite Fort Boisé in Idaho Territory, alternate sections of public lands, designated by odd numbers, to the extent of three sections in width on each side of said road; that said act provided that the lands granted should be exclusively applied to the construction of said road and to no other purpose, and should be disposed of only as the work progressed, and that any and all lands theretofore reserved to the United States, or otherwise appropriated by act of Congress or other competent authority, should be and the same were thereby reserved from the operation of said act, except so far as it might be necessary to locate the route of said road through the same, in which case the right of way to the width

of one hundred feet was granted; that it was further, provided that the grant should not embrace any mineral lands of the United States, that the lands thereby granted to said State should be disposed of by the legislature thereof for the purpose aforesaid, and for no other, that the said road should be and remain a public highway for the use of the government of the United States, free from tolls or other charges upon the transportation of any property, troops or mails of the United States, and that the said road should be constructed with such width, gradation and bridges as to permit of its regular use as a wagon road, and in such other special manner as the State of Oregon might prescribe; that the said act also authorized the State to locate and use, in the construction of said road, an additional amount of public lands, not previously reserved to the United States or otherwise disposed of, and not exceeding ten miles in distance from it, equal to the amount reserved from the operation of the act, to be selected in alternate odd sections, as provided therein; that the lands thereby granted to said State should be disposed of only in the following manner, that is to say, when the governor of the State should certify to the Secretary of the Interior that ten continuous miles of said road were completed, then a quantity of the land granted by the act, not exceeding thirty sections, might be sold, and so on from time to time until said road should be completed, and, if it was not completed within five years, no further sales should be made, and the lands remaining unsold should revert to the United States; and that the United States surveyor general for the district of Oregon should cause the lands so granted to be surveyed at the earliest practicable period after the State should have enacted the necessary legislation to carry said act of Congress into effect.

The bill further set forth, that on the 20th of October, 1868, the legislative assembly of the State of Oregon passed, and the governor approved, an act (Laws of Oregon, of 1868, p. 3) entitled "An act donating certain lands to Dalles Military Road Company," which act, after setting forth the passage of the act of Congress of February 25, 1867, granted to Dalles Military Road Company, incorporated March 30, 1868,

all lands, right of way, rights, privileges and immunities there-·
tofore granted or pledged to the State by said act of Congress,.
for the purpose of aiding said company in constructing the
road mentioned and described in said act of Congress, upon the
conditions and limitations therein prescribed; that said act of
the State also granted and pledged to said company all moneys,
lands, rights, privileges and immunities which might be there-
after granted to the State to aid in the construction of such
road, for the purposes and upon the conditions mentioned in
said act of Congress, or which might be mentioned in any fur-
ther grants of money or lands to aid in constructing said road;
and that said act of the State authorized the company to lo-
cate, subject to the approval of the governor of the State, the
lands mentioned in 'said act of Congress within the ten miles
limit prescribed by the latter act, in lieu of lands reserved.

The bill further set forth, that the State of Oregon never
passed any law for the special purpose of carrying into effect
the act of Congress of February 25, 1867, but had passed, on
the 14th of October, 1862, an act (General Laws of Oregon, of
1862, reported by Code Commission, p. 3) entitled "An act
providing for private incorporations and the appropriation of
private property therefor," which provided, among other
things, that any road, other than a railroad, constructed by a
corporation formed under the said act, should be cleared of
standing timber for thirty feet in width, and should have a
track in the centre not less than sixteen feet wide, finished and
kept in good travelling condition, except when the cutting on
said road was six feet or more deep on either side, in which
case such track need not be more than ten feet wide, with
turnouts of sixteen feet in width for every quarter of a
mile of such narrow track; that all streams or other waters
upon the line of such roads should be ·safely and securely
bridged, except where the county court of the county wherein
the line of such road might cross such streams or other water,.
or, if such stream or other water formed the boundary between
two counties, then the county court of either of said counties
might authorize the corporation to place a ferry boat upon
such stream or other water, to be kept and run for such toll as

the county court might prescribe, and in the manner required of ferries established under the general statutes in relation to ferries, or except where such county court might authorize such corporation to connect their road with a ferry then or thereafter established over such stream or other water under the general statute in relation to ferries; and that those provisions of said act of October 14, 1862, had been at all times thereafter and still remained in force.

The bill further set forth that the Dalles Military Road Company was a private corporation, purporting to have been incorporated on the 30th of March, 1868, under the general laws of the State of Oregon; that the business in which it proposed to engage was the location and construction of a clay road from Dalles City in the county of Wasco, Oregon, by way of Camp Watson and Cañon City, to a point on Snake River opposite Fort Boisé in Idaho Territory, about two miles below the mouth of Owyhee River; that James K. Kelly and two other persons were the incorporators thereof; that on the 11th of January, 1871, the company, by its then directors, five in number, in pursuance of the unanimous vote of the stockholders, made and filed supplementary articles of incorporation, which provided that the additional business in which the corporation proposed to engage was to accept and receive any and all grants of land and other things of value from the United States to the State of Oregon, and to purchase and hold land and other property which its directors might deem necessary and convenient for its interests, and to engage in any business incident to and connected with receiving any such grant, and in selling, conveying, purchasing and holding any land or property that might come into the possession of the company, and also to establish and keep a toll road on any part of the road belonging to it; and that the corporation was still in being, and the officers thereof were James K. Kelly, president, and C. N. Thornbury, secretary. .

The bill further set forth, that on the 1st of January, 1869, and on divers other days between that day and the 23d of June, 1869, the officers, stockholders and agents of the company, and other persons acting in their and its interests, falsely

and fraudulently represented to George L. Woods, then the governor of Oregon, that said road had been constructed as by law required, they then knowing that said representations were false, and that said road had not been constructed; that they made such representations for the sole purpose of fraudulently procuring from the said governor a certificate declaring that the road had been constructed in accordance with the act of Congress of February 25, 1867; and of the act of the State of October 20, 1868; that the said governor, in consequence of such representations, made and issued a certificate, dated June 23, 1869, under his hand and the great seal of the State, and attested by the secretary of state, which set forth as follows: "I, George L. Woods, governor of the State of Oregon, do hereby certify that this plat or map of the Dalles Military Road has been duly filed in my office by the Dalles Military Road Company, and shows, in connection with the public surveys, as far as said public surveys are completed, the location of the line of route as actually surveyed, and upon which their road is constructed in accordance with the requirements of an act of Congress approved February 25, 1867, entitled 'An act granting lands to the State of Oregon to aid in the construction of a military wagon road from Dalles City, on the Columbia River, to Fort Boisé, on Snake River,' and with the act of the legislative assembly of the State of Oregon approved October 20, 1868, entitled 'An act donating certain lands to Dalles Military Road Company.' I further certify that I have made a careful examination of said road since its completion, and that the same is built in all respects as required by the said above-recited acts, and that said road is accepted."

The bill further alleged, that the company had not constructed at any time a road upon any line of route located or surveyed anywhere within the limits of the grant of land provided for in said act of Congress, or at all; that the said governor knew this, and had not made any examination of any road constructed or owned by the company; that said certificate was procured by the company, through such false representations, in order to enable it fraudulently to obtain possession of the lands lying within the limits of the grant

provided for in said act of Congress; that the acceptance of said pretended road by said governor was a fraud upon the United States; that the road never was built, graded, bridged, cleared or constructed, either in whole or in part, so as to be a public highway, or so as to permit the transportation of any property, troops or mails of the United States over the same, and was not and never had been maintained as a public highway by any of the defendants or any person or persons claiming any interest in the lands embraced within the limits provided for by said act of Congress; that neither the said lands nor the proceeds thereof had ever been exclusively or at all applied to the construction of the road or any part thereof, or of any bridges thereon, or to the establishment of ferries on any streams along the line of the road; and that the lands granted by said act of Congress had not been disposed of by the State of Oregon for the purposes expressed in said act.

The bill further alleged that on the 18th of June, 1874, Congress passed an act (18 Stat. 80, c. 305) entitled " An act to authorize the issuance of patents for lands granted to the State of Oregon in certain cases," which, after reciting that certain lands had theretofore by acts of Congress been granted to said State to aid in the construction of certain military wagon roads in that State, and that there existed no law providing for the issuing of formal patents for said lands, provided as follows : " That in all cases when the roads in aid of the construction of which said lands were granted are shown by the certificate of the governor of the State of Oregon, as in said acts provided, to have been constructed and completed, patents for said lands shall issue in due form to the State of Oregon as fast as the same shall, under said grants, be selected and certified, unless the State of Oregon shall by public act have transferred its interests in said lands to any corporation or corporations, in which case the patents shall issue from the General Land Office to such corporation or corporations, upon their payment of the necessary expenses thereof : *Provided,* That this shall not be construed to revive any land grant already expired, nor to create any new rights of any kind except to provide for issuing patents for lands to

which the State-is already entitled ; " and that on the 19th of June, 1876, the President of the United States, imposed upon by said fraudulent certificate, issued to the company a patent for 126,910.23 acres of land, included in the grants made, or intended to be made, by said acts of Congress.

The bill then set forth, that, by certain conveyances the title of the company became vested in the defendant, the Eastern Oregon Land Company, a private corporation; that the deeds conveyed the lands in bulk, and purported to grant to the respective grantees all the lands lying and being in Oregon, granted or intended to be granted to that State by the act of Congress of February 25, 1867, and granted or intended to be granted by the State to the road company by the act of October 20, 1868, the substantive parts of both of said acts being recited in all of the deeds and expressly made parts of each of them; and that the Eastern Oregon Land Company was a private corporation created under the laws of California, on September 26, 1884, its business being, among other things, to buy and sell lands in Oregon, and it being an existing corporation.

The bill further averred, that the maps or plats referred to in the certificate of the governor showed the line of the pretended road to be 357 miles, which would make the grant of lands covered by the act of Congress of February 25, 1867, embrace in the aggregate 685,440 acres, of which 558,529.77 acres were not yet patented to the Dalles Military Road Company, and it claimed the right to have a patent therefor.

The bill further alleged that each of the defendants, and the intermediate grantors and grantees, had full knowledge, at the time of the execution and delivery of the deeds, that the road provided for by said act of Congress had not been constructed and maintained as required thereby and by the laws of Oregon, so as to be a public highway, or so that it could be used by the United States or by any of the citizens or residents thereof as a public highway, or so that the United States could transport its property, troops or mails over the same, and also had full knowledge that no grades had been established or constructed upon any part of said road, no

ferries established or maintained, no clearing done, no cuts made and no turnouts constructed, anywhere on said line of road, no bridges built or maintained over any streams on said line, and had full knowledge that said road was not begun or completed within five years from the date of the passage of said act of Congress, that the statements made in said certificate were false, that the governor did not at any time examine the road, that said certificate had been procured by such false and fraudulent representations, and that said patent was procured to be issued upon said false and fraudulently procured certificate.

The prayer of the bill was that all the lands granted to the State of Oregon by the act of Congress of February 25, 1867, be decreed to be forfeited to the United States, and restored to the public domain; that the said certificate, patent and deeds be declared fraudulent and void; and for further relief. Copies of the patent and of the deeds are annexed to the bill.

The Dalles Military Road Company, Kelly and Thornbury excepted to the bill for impertinence. These exceptions were sustained. 40 Fed. Rep. 114.

By leave of the court, the defendants D. V. B. Henarie, Eleanor Martin, P. J. Martin and the Eastern Oregon Land Company, on the 17th of October, 1889, filed two pleas to so much of the bill as prayed that the land granted to the State of Oregon by the act of Congress of February 25, 1867, and owned by those defendants, be decreed to be forfeited to the United States. The first plea set up that Woods, the then governor, without any false representations having been made to him, and without any fraud on his part, certified, on June 23, 1869, that the plat or map of the road had been filed in his office by the company, and showed the location of the line of route as actually surveyed, and upon which its road had been constructed in accordance with the requirements of said act of Congress and the act of the State of October 20, 1868, and that he had made a careful examination of said road since its completion, and that the same was built in all respects as required by said acts, and the said road was then accepted; that, on the 31st of May, 1876, the com-

pany, for a valuable consideration, to wit, $125,000, paid to it
by Edward Martin, sold and conveyed all the said lands
belonging to it to the said Martin, his heirs and assigns, and
that, by sundry mesne conveyances from Martin to the East-
ern Oregon Land Company, the title to said lands became and
then was vested in that company.

The second plea, after setting forth the contents of the gov-
ernor's certificate of June 23, 1869, averred that on December
18, 1869, the Commissioner of the General Land Office with-
drew from sale the odd numbered sections within three miles
from each side of said road in favor of the Dalles Military
Road Company; that Congress passed the act of June 18,
1874; that Edward Martin, placing confidence in the truth of
said governor's certificate of June 23, 1869, and in the order of
withdrawal of the Commissioner of the General Land Office
of December 18, 1869, and believing that the act of Congress
of June 18, 1874, would be carried into effect, purchased from
said company, on the 31st of May, 1876, in good faith, for the
consideration of $125,000 then paid by him to the company,
all the lands embraced in the grant to it, except such portions
as had been previously sold by it; that, prior to the time he
paid said purchase money and received his deed, he had no
notice of any failure on the part of the company to construct
and complete the road, and had no reason to believe that it
was not constructed in accordance with the act of Congress,
but was informed and believed that it had been constructed
with such width, gradation and bridges as to permit of its
regular use as a wagon road; and that he thus became a *bona
fide* purchaser, for a valuable consideration, of all the lands
then owned by the company, which it then conveyed to him.
The plea then averred the execution by him on January 31,
1877, of a deed of trust acknowledging that said Martin held
an undivided one-fourth of said lands in trust for said D. V. B.
Henarie; and that when Martin purchased the lands Henarie
had paid one-fourth of the $125,000, in good faith, relying
upon the certificate of the governor and on the act of Con-
gress of June 18, 1874, and had no notice that the road had
not been constructed and completed by the company as re-

quired by the act of Congress.   The plea then set forth proceedings and deeds by which the title of Martin, (who had died,) and the title of all other persons, became vested in the Eastern Oregon Land Company, and averred that the latter company then held the legal title to all the lands granted to the Dalles Military Road Company, except such as had theretofore been sold and conveyed by the latter company and its grantees and the Eastern Oregon Land Company.   On the same date the defendants who filed those two pleas filed an answer in support of them.

On the 25th of October, 1889, the Dalles Military Road Company, and Kelly and Thornbury, who were, respectively, president and secretary of the company, filed an answer to the bill. No replication appears to have been filed to this answer.

The case was heard upon the pleas above mentioned, and the court, on the 18th of February, 1890, entered a decree sustaining the pleas and dismissing the bill.   The opinion of the court, delivered by Judge Sawyer, the Circuit Judge, is reported in 41 Fed. Rep. 493.   In the opinion, it was held that both of the pleas were good.   As to the first plea, the view taken was, that the authority to determine whether the road was completed was vested solely in the governor of Oregon, who was the agent of the United States in the premises; that his decision was, in the absence of fraud, final and conclusive; and that the government was estopped from denying its finality.   As to the second plea, it was held to be good because it alleged that the defendants were *bona fide* purchasers from the Dalles Military Road Company, without notice of any fraud or defect in the title, and that the defendants were entitled to rely upon the acts of Congress of 1867 and 1874, the act of the State of Oregon, the certificate of the governor of that State, the withdrawal of the lands from sale, and the issue of the patent.   After deciding that the two pleas were valid and sufficient, the opinion proceeded: "The remaining question to be considered, and the only one presented upon which there is any room for doubt, is whether complainants should be permitted to reply to the pleas, or whether the bill should be dismissed.   Upon the whole, after careful consideration, I think

the bill should be dismissed. I think it in the highest degree probable that such would be the final result, whichever course is pursued. If so, the expense and annoyance of a long litigation would be fruitless." The opinion then held that the bill must be dismissed, on the ground that subsequent purchasers were entitled to rely upon the certificate of the governor; that the act of Congress of June 18, 1874, affirmed the truth of the certificate and authorized the issuing of the patent; and that the claim of the United States was stale.

We are of opinion that the Circuit Court erred in not permitting the plaintiffs to reply to the pleas, and in dismissing the bill absolutely. It is provided by rule 33 of the Rules of Practice in Equity, that the plaintiff may set down a plea to be argued, or may take issue upon it. This does not mean that the plaintiff is to make thereby such a conclusive election that, if he sets down the plea to be argued and it is sustained on the argument, he cannot afterwards take issue on it. By rule 34, on the overruling of a plea on hearing, the defendant has a right to answer the bill. The object of having a plea set down for hearing is to induce the presentation to the court, as a question of law, of the matters set up in the plea, so that, assuming those matters to be true in point of fact, the whole controversy may, perhaps, be determined as a question of law. But this practice would be discouraged, if the plaintiff were not to be allowed, in case the plea be sustained in matter of law, to take issue upon it as matter of fact. Rule 35 provides that, in case upon a hearing a plea is allowed, the court may, in its discretion, upon motion of the plaintiff, allow him to amend his bill. But there is no restriction put upon the right of the plaintiff to take issue upon a plea after it is allowed on a hearing; and such is the view which has been adopted by this court.

In *State of Rhode Island* v. *State of Massachusetts*, 14 Pet. 210, 257, it is laid down by the court, speaking by Chief Justice Taney, that if a plea, upon argument, is ruled to be sufficient in law to bar the recovery of the plaintiff, the court would, according to its uniform practice, allow him to put in issue, by a proper replication, the truth of the facts stated in the plea.

In 1 Daniell's Chancery Pleading & Practice, 4th ed. c. 15,

sec. 5, p. 696, it is said, that if a plea is allowed upon argument, the plaintiff may take issue upon it, and proceed to disprove the facts upon which it is endeavored to be supported, and that he does this by filing a replication in the same manner as if the defendant had answered the bill in the usual way. To the same effect, see Cooper's Eq. Pl. 232; Beames on Pleas in Equity, 316 to 318; Rule of Lord Chancellor King, 12 Geo. I., Gilbert's Reports in Equity, 184, 2d ed. folio, 1742; Story's Eq. Pl. § 697; and Mitf. Ch. Pl., by Jeremy, 301.

Various matters of fact are alleged in the pleas, which the plaintiffs have a right to controvert, such as that there were no fraudulent representations made to the governor, that he made the certificate without any fraud on his part, that Martin was a *bona fide* purchaser for a valuable consideration, without notice, that Henarie was likewise, and that the subsequent grantees were such *bona fide* purchasers.

The decree must be reversed in so far as it dismisses the bill, and the case be remanded to the Circuit Court, with a direction to allow the plaintiffs to reply to, and join issue on, the pleas.

Case No. 1219 is a similar bill in equity, filed by the Attorney General of the United States, on their behalf, against the Oregon Central Military Road Company, the California and Oregon Land Company and nineteen individual defendants. It alleges, that, on the 2d of July, 1864, Congress passed an act (13 Stat. 355) entitled "An act granting lands to the State of Oregon, to aid in the construction of a military road from Eugene City to the Eastern boundary of said State," which granted to the State of Oregon, to aid in the construction of such wagon road, alternate sections of public lands, designated by odd numbers, for three sections in width on each side of said road, to be exclusively applied in the construction of the road and to no other purpose, and to be disposed of only as the work should progress. The provisions of the act of Congress of July 2, 1864, were substantially the same as those of the act of Congress of February 25, 1867, considered in No. 1218.

The bill sets forth an act of the State of Oregon, of October 24, 1864, (Laws of Oregon of 1864, p. 36,) entitled "An act

donating certain lands to the Oregon Central Military Road Company," granting to that company all the lands and rights granted to the State by the act of Congress of July 2, 1864, for the purpose of aiding the company in constructing the road mentioned in the act of Congress, and all lands and rights which might be thereafter granted to the State to aid in the construction of such road; and also that, on the 26th of December, 1866, Congress passed an act (14 Stat. 374) granting to the State for such purpose such odd sections or parts of odd sections not reserved or otherwise legally appropriated, within six miles of each side of the road, to be selected by the surveyor general of the State, as should be sufficient to supply any deficiency in the quantity of the grant, occasioned by any lands sold or reserved, or to which the rights of preëmption or homestead had attached, or which, for any reason, were not subject to such grant, within the designated limits.

The bill also contains like allegations with the bill in No. 1218, in regard to the passage of the act of the State of Oregon of October 14, 1862, and avers that the Oregon Central Military Road Company is a private corporation purporting to have been incorporated on the 15th of April, 1864, under the general laws of the State of Oregon, to construct a wagon road from Eugene City in a southeasterly direction to the southeastern corner of the State, by way of the middle fork of the Willamette River; that on the 27th of July, 1866, the officers, stockholders and agents of the company and other persons, acting in their and in its interest, fraudulently represented to Addison C. Gibbs, then the governor of Oregon, that the road had been constructed for 50 miles from Eugene City eastward, they well knowing that such representations were false and that the road had not been constructed at all; that such representations were made for the purpose of fraudulently procuring from said governor a certificate that the road had been constructed in accordance with the act of Congress of July 2, 1864, and of the act of the State of Oregon of October 24, 1864; that in that certificate the governor certified that, in accordance with said two acts, he had passed over and carefully examined the first 50 miles of the road of the company,

beginning at Eugene City and extending eastward towards the southern or eastern boundary of the State, and that the first continuous 50 miles of said road beginning at Eugene City were completed in accordance with the requirements of said act of Congress and the laws of Oregon; that it was not true that the 50 miles of road referred to had been constructed; that, in order to procure the certificate and to use the same to secure the control of the land within the limits of the grant provided for in the act of Congress, the company, by its officers, agents and representatives, fraudulently pointed out to the governor a county road to which the company never had any legal right, and led the governor to believe that the road had been constructed by the company under the said acts; that, on the 26th of November, 1867, like fraudulent representations were made to George L. Woods, then governor of Oregon, in regard to 42½ additional miles of the road; that on that date the said governor made a certificate that such 42½ miles, more or less, had been carefully inspected and found to be well and faithfully built in accordance with the requirements of the law, and, therefore, the same was approved and received; that the 42½ miles had not been constructed and the governor well knew that, and no inspection of any road constructed or owned by the company had been made by the authority of the governor; that, on the 12th of January, 1870, like fraudulent representations were made to the same governor by the officers, stockholders and agents of the company and other persons acting in their and its interest, that the road had been constructed as by law required, and they presented a map falsely showing the same and its route; that the certificate made by the governor on that day stated that the plat or map of the road had been duly filed in his office by the company, and showed that portion of the road commencing at Eugene City and ending at the eastern boundary of the State, which had been completed as required by the act of Congress and the act of the State; that it was not true that the company had constructed a road upon any line of route located or surveyed anywhere within the limits of the grant of land provided for in the act of Congress or at all; that said

governor then and there well knew this; and that it was not true that he made or caused to be made any examination of any road constructed or owned by the company.

The bill contains like allegations with the bill in No. 1218, in regard to non-compliance with the act of Congress granting the lands, and in regard to the act of Congress of June 18, 1874; and avers that in 1867, 1871 and 1873 the Secretary of the Interior and the Commissioner of the General Land Office, deceived by such fraudulent certificates, executed and delivered to the State of Oregon, for the benefit of the road, seven certified lists of lands, covering 361,327.43 acres, as intended to be granted by the acts of Congress, which lists were claimed to have the force and effect of patents; that thereafter, the President of the United States, deceived by said fraudulent certificates, issued to the company two patents for 40,913.24 acres of land included in the grants; that afterwards, by various deeds, the lands were conveyed in bulk to the California and Oregon Land Company, as lands covered by the act of Congress of July 2, 1864, and by the act of the State of Oregon of October 24, 1864; that the California and Oregon Land Company is a private corporation, incorporated January 9, 1877, under the general laws of the State of California; that the maps or plats referred to in said certificates showed the line of the pretended road to be 420 miles, which would make the grant of lands covered by the act of Congress of July 2, 1864, embrace in the aggregate about 720,000 acres, of which 402,240.67 acres had been in effect patented to the road company, and for the remaining 317,759.33 acres that company inequitably claimed the right to have a patent issued.

The bill also avers, that the two companies and the nineteen individual defendants, at the time of the accruing of their interests in the lands, had full knowledge that the road had not been constructed and maintained as required by the act of Congress and the laws of Oregon, so as to be in any sense a public highway, or so that it could be used by the United States, or by any of its citizens or residents, as a public highway, or so that the United States could transport its property, troops or mails over the same, and also had full knowledge

that no grades had been established or constructed upon any part of the road, or any clearing done, or any bridges built over any streams on its line, or any cuts made, or any turnouts constructed, or any ferries established or maintained over any streams, and that the road was not begun or completed within five years from the date of the passage of the act of Congress of July 2, 1864, and that the statements made in the said certificates of the governors were false, and that they did not at any time examine the road, and that the certificates had been procured by such false and fraudulent representations, and that said patents were procured to be issued upon such false certificates.

The prayer of the bill is that the lands granted to the State by the act of Congress of July 2, 1864, be decreed to be forfeited to the United States and restored to the public domain; that the certificates, lists, patents and deeds described in the bill be decreed fraudulent and void; and for general relief.

Exceptions were filed to the bill for impertinence by the California and Oregon Land Company and nine of the individual defendants; which exceptions were sustained. 40 Fed. Rep. 120.

On the 24th of October, 1889, the California and Oregon Land Company, by leave of the court, filed two pleas to the bill. It also filed an answer sustaining the pleas. The case was heard upon the bill and the pleas, and a decree was entered on the 18th of February, 1890, sustaining the pleas and dismissing the bill. The opinion of Judge Sawyer, the Circuit Judge, (41 Fed. Rep. 501,) states that the pleas were held sufficient and the bill dismissed for the reasons stated in the opinion in No. 1218.

The first plea relies on the three certificates of the governors as having been made in good faith and without any fraudulent intent or false representation. The second plea relies on the three certificates and the delivery of the certified lists embracing the 361,327.43 acres of land; and avers that fifteen of the individual defendants, on the faith of said certificates and certified lists, purchased from two of the individual defendants, in good faith and for a valuable consideration, all the lands granted by the act of Congress which the Oregon

Central Military Road Company had conveyed, without notice of the fraudulent representations set forth in the bill, and without any reason to believe that there had been any fraudulent misrepresentations in examining or certifying the completion of any part of the road, or that it had not been completed in accordance with the requirements of the statutes; that those individual purchasers conveyed to the California and Oregon Land Company their interests in the grant; that at that time neither said land company nor any of its officers, agents or stockholders had any notice or reason to believe that there had been any fraud or misrepresentation or failure of duty in such examination or certifying; that there had been paid *bona fide* by the land. company and its promoters, as expense attending the lands and in taxes, large sums of money, and sales and transfers of the stock of the land company had been made to others than its original stockholders, who had purchased such stock relying on the truth of said certificates, and on said listing of the lands, and on the act of Congress of June 18, 1874, and without any notice of, or reason to suspect, any of the fraudulent representations charged in the bill, the capital stock of the company being held by twenty-five stockholders, of whom only eight were original stockholders or are defendants in this suit.

For the reasons set forth in regard to case No. 1218, the decree of the Circuit Court, so far as it dismisses the bill, must be reversed, and the case be remanded to that court with a direction to allow the plaintiffs to reply to and join issue on the pleas.

In No. 1248, the bill is filed by the Attorney General of the United States, on their behalf, against the Willamette Valley and Cascade Mountain Wagon Road Company, the Willamette Valley and Coast Railroad Company, the Oregon Pacific Railroad Company, the Farmers' Loan and Trust Company, two individual defendants named David Cahn and Alexander Weill and five other individual defendants.

The bill alleges that, on the 5th of July, 1866, Congress passed an act (14 Stat. 89) entitled " An act granting lands to the State of Oregon to aid in the construction of a military road from Albany, Oregon, to the eastern boundary of said

State," granting to the State alternate sections of public lands, designated by odd numbers, three sections per mile, to be selected within six miles of said road, and to be exclusively applied in the construction of the road, and to no other purpose, and to be disposed of only as the work should progress, and containing substantially similar provisions with the grants made in the acts of Congress in cases Nos. 1218 and 1219.

The bill sets forth, that the State of Oregon, by an act passed October 24, 1866, (Laws of .Oregon of 1866, p. 58,) granted to the Willamette Valley and Cascade Mountain Wagon Road Company all lands and rights granted to the State by said act of Congress, for the purpose of aiding the company in constructing the road mentioned in the act, and also all lands and rights which might thereafter be granted to the State to aid in constructing the road ; and that by an act of Congress passed July 15, 1870, (16 Stat. 363,) a change was made in the route of the road.

The bill then makes the same allegations as in Nos. 1218 and 1219, as to the act of Oregon of October 14, 1862. It alleges that the road company was incorporated on the 12th of March, 1864, under the general laws of the State, to construct a wagon road by a specified route; that, on the 8th of September, 1866, it filed supplemental articles of incorporation changing the line of its road so as to begin at Albany and run over the Cascade Mountains to the eastern boundary of the State; that, on the 19th of August, 1871, by supplemental articles of incorporation, it changed the route of its road so as to conform to the act of Congress of July 15, 1870; that, on the 11th of May, 1868, the officers, stockholders and agents of the company and other persons acting in their and its interest fraudulently represented to the acting governor of Oregon that the road had been constructed as required by law for a distance of 180 miles. eastward from Albany, they knowing that such representations were false and that the road had not been constructed at all ; that such representations were made for the purpose of fraudulently procuring from the acting governor a certificate that the road for that distance had been constructed in accordance with the act of Congress of July 5,

1866, and the act of the State of October 24, 1866; that the acting governor on that day certified that the plat or map of the road had been duly filed in his office by the company, and showed that the portion of the road commencing and ending as designated on the map had been completed as required by those acts; that the acting governor did not examine or cause to be examined any part of the 180 miles; that the certificate was procured by the company to enable it fraudulently to obtain control of lands lying within the limits of the grant for the distance of 180 miles east of Albany; that, on the 8th of September, 1870, the officers, stockholders and agents of the company and other persons acting in their and its interest, fraudulently represented to the then governor of the State that the road had been constructed as required by law from the 153d mile post east from Albany to Camp Harney, they well knowing that such representations were false, and that the road had not been constructed at all; that such representations were made for the sole purpose of fraudulently procuring from the governor a certificate declaring that the road for that distance had been constructed in accordance with the said acts; that on the same day the governor made a certificate that the plat or map of the road had been filed in his office by the company, and showed, in connection with the public surveys, the location of route of the extension of the road as actually surveyed from the 153d mile post east from Albany, extending fourteen sections, to Camp Harney, in the line of the road, as definitely fixed in compliance with the act of Congress and the act of the State, and that said extension of the road had, by his direction, been examined and accepted from the 153d mile stake to Camp Harney, and embracing the 29th section, inclusive; that it was not true that the company had constructed the road in question; that the governor well knew this; that it was not true that he had directed any part of the road to be examined; that such certificate was procured by the company in order to enable it fraudulently to obtain control of the lands in question; that, on the 9th of January, 1871, the officers, stockholders and agents of the company, and other persons acting in their and its interest, fraudulently represented

to the then governor that the road had been constructed from the 29th section to the 36.8th section thereof, they well knowing that such representations were false, and that the road had not been constructed at all, and having made such representations for the sole purpose of fraudulently procuring from the governor a certificate declaring that the road for such distance had been constructed in accordance with said acts; that on the same day the governor made a certificate that the plat or map of the road had been filed in his office by the company and showed, in connection with the public surveys, the location of the route of the road as actually surveyed from Albany, extending from the 29th section to the 36.8th section in the line of the road as definitely fixed in compliance with the said acts, and that the road had been, by his direction, examined and accepted from the 29th section to the 36.8th section, inclusive, and had been completed in accordance with the act of Congress; that it was not true that such road had been constructed; that on the 24th of June, 1871, the then officers, stockholders and agents of the company, and other persons acting in their and its interest, fraudulently represented to the same governor that the road had been constructed as required by law from the 36.8th section thereof to the 44.87th section, inclusive, terminating at the eastern boundary of the State, they well knowing that such representations were false and that the road had not been constructed at all; that such fraudulent representations were made for the sole purpose of fraudulently procuring from the governor a certificate declaring that said road for that distance had been constructed in accordance with said acts; that on the same date the governor, in consequence of such false representations, made a certificate certifying that the plat or map of the road had been filed in his office by the company, and showed the location of route as actually surveyed (there being no public surveys in connection with the route to his knowledge) of the road from Albany to the eastern boundary of the State, the part therein being from the 36.8th section to the 44.87th section, inclusive, in the line of the road, terminating at the eastern boundary of the State, as definitely fixed in compliance with said acts, that

said road had been, by his direction, examined and accepted from the 36.8th section to the 44.87th section, inclusive, terminating at the eastern boundary of the State, and that the same had been completed according to the act of Congress.

The bill further alleges, that the road never was constructed either in whole or in part, so as to be a public highway or so as to permit of the transportation of any property, troops or mails of the United States over it, and had never been maintained as a public highway, and never was examined as stated in said certificate; that neither the lands nor their proceeds had ever been applied to the construction of any part of the road or of any bridges thereof, or the establishment of any ferries on any streams along the line of any part of the road.

The bill then sets forth the act of Congress of June 18, 1874, as in Nos. 1218 and 1219, and avers, that on the 19th of June, 1876, the President of the United States, deceived by such fraudulent certificates, issued to the State of Oregon, for the use and benefit of the company, a patent for certain described lands, aggregating 107,893.01 acres, and on the 30th of October, 1882, a patent to the company for 440,356.52 acres. The bill then sets forth conveyances of certain of the lands to the defendant Cahn in trust for the defendants Hogg and Weill and one Clark, the vesting of title to some of the lands in Weill individually, and to him in trust for Cahn and the defendants Arnstein and Meyer, the deeds covering all the lands granted, or intended to be granted, to the State by the act of Congress, or by the State to the company by its act; that Hogg still claimed an interest in the lands; that the Willamette Valley and Coast Railroad Company, an Oregon corporation, and the Oregon Pacific Railroad Company, another Oregon corporation, each of them claimed a legal interest in all the lands; that the Farmers' Loan and Trust Company, a New York corporation, claimed a legal and an equitable interest in the lands; that the Willamette Valley and Cascade Mountain Road Company and the Willamette Valley and Cascade Mountain Military Wagon Road Company were one and the same; that the maps or plats referred to in the certificates ᵖᵛed the line of the road to be 456½ miles, which would

make the grant of land covered by the act of Congress 876,480 acres, of which 327,730.47 acres were not yet patented to the road company, and that the company claimed the right to have a patent issued therefor; that the four corporation defendants and five of the individual defendants, at the time their interests accrued, had full knowledge that the road had not been constructed and maintained as required by the acts of Congress and the laws of the State, so as to be in any sense whatsoever a public highway, or so that it could be used by the United States, or by any citizens or residents thereof, as a public highway, or so that the United States could transport its property, troops or mails over the same, and that no grades had been constructed upon any part of the road, nor any clearing done, nor any bridges built over any streams, nor any cuts made, nor turnouts constructed, nor any ferries maintained over any streams; and that the road was not begun or completed within five years from the date of the passage of the act of Congress, and that each of said defendants knew that the statements made in the certificates of the governors and acting governor were false, and that they did not at any time examine the road, and that the certificates were procured by said fraudulent representations, and that the said patents were procured to be issued upon said fraudulently procured certificates.

The prayer of the bill is that all the lands granted to the State by the act of Congress of July 5, 1866, be decreed to be forfeited to the United States and restored to the public domain; that the said certificates, patent and deeds be declared fraudulent and void; and for general relief.

The defendants, Weill and Cahn, by leave of the court, filed pleas to the bill, and an answer in support of the pleas. The defendants Hogg, the Willamette Valley and Coast Railroad Company, the Willamette Valley and Cascade Mountain Wagon Road Company and the Oregon Pacific Railroad Company filed exceptions to the bill for impertinence, which exceptions were sustained. The Farmers' Loan and Trust Company filed pleas to the bill, with an accompanying answer. The defendants Hogg, the Willamette Valley and Coast Railroad Company and the Oregon Pacific Railroad Company filed pleas to the bill, with an answer supporting the pleas.

The cause was heard upon the pleas of the defendants Weill and Cahn, by Judge Deady, and a decree entered sustaining them and dismissing the bill as to those defendants. The opinion of the court is reported in 42 Fed. Rep. 351. Subsequently, the cause was heard upon the pleas and answers of the defendants, Hogg, the Willamette Valley and Coast Railroad Company, the Oregon Pacific Railroad Company and the Farmers' Loan and Trust Company, and a decree was entered on the 12th of May, 1890, sustaining the pleas and dismissing the bill as to those defendants.

Weill and Cahn filed two pleas. The first plea sets up that the Secretary of the Interior, after duly investigating a complaint that the road had not been constructed as required by the act of Congress, directed the Commissioner of the General Land Office to certify the lands for patent under the act of Congress of July 18, 1874; that the patent for the 440,856.52 acres was thereafter duly issued to the road company; that the defendants Weill and Cahn, relying upon those facts, so altered their position in reference to the lands as would render it inequitable for the United States to assert any right to forfeit or reclaim the lands; that those defendants had laid out, in securing the patents, in selecting other lands which had not yet been patented and in taxes, expenses and protecting their title, large sums of money, and had sold portions of the land with warranty, and had expended a large sum in rebuilding and improving the road through its entire length, and in constructing bridges.

The second plea of Weill and Cahn avers that, in 1871, the attention of Weill was called to the existence of the road company and its ownership of the land grant; that it was represented that the road had been fully constructed and the grant earned, that the company held title to the lands, and that they were for sale; that Weill joined with Hogg and one Clarke to purchase the lands, which was done, and they were deeded by the road company to Clarke in August, 1871; that, in September, 1871, Clarke conveyed the lands to Cahn, to hold them in trust for Weill, Hogg and Clarke, according to their respective interests; that the greater part of the lands was then un-

surveyed, a few sections had been selected, and none had been patented by the United States to the road company or to the State of Oregon, and for additional protection Weill and Clarke purchased the stock of the road company; that, at the time of the first conveyance by the road company, Weill had paid, in the purchase of the lands, over $140,000, and Clarke over $20,000; that at that time the certificates of the governors of Oregon had been made and duly filed in the office of the secretary of state of the State and in the Department at Washington; that said defendants relied upon those certificates; and that in 1879 Weill purchased the interests of Clarke and Hogg in the lands for $21,400, all of them believing that the road had been completed as required by the act of Congress and as certified. The plea denies all fraud or notice of any fraud or of any claim on the part of the United States at the time the defendants acquired title to any part of the lands, and avers that they are purchasers in good faith, without notice, for a valuable consideration.

The answer which accompanies these pleas contains averments in support of them, and alleges that but for the existence of the certificates Weill would not have purchased the lands. To the pleas and answer are annexed the reports of the special agent of the United States and of committees of Congress, and a letter of the Secretary of the Interior.

The pleas and answer of the Farmers' Loan and Trust Company set forth the principal matters appearing in the pleas and answer of Weill and Cahn; and the answer alleges that the trust company is the trustee for certain holders of bonds secured by a mortgage made to it, as trustee.

The pleas and supporting answer of Hogg, the Willamette Valley and Coast Railroad Company and the Oregon Pacific Railroad Company set forth substantially the same matters contained in the pleas and answer of Weill and Cahn and in those of the Farmers' Loan and Trust Company.

The first plea of Weill and Cahn was treated by the Circuit Court as a plea of estoppel. On the facts stated in that plea, the court held that the claim made in the bill was a stale claim; and that the delay or lapse of time constituted a bar

to the relief sought, and ought to have the same effect as in a suit between private parties. The court also held that the second plea of Weill and Cahn was good, because it set up all the elements of a *bona fide* purchase for a valuable consideration ; that the certificates of the governors were conclusive as to the fact of the completion of the road ; and that the lands could not be forfeited to the United States, even if the certificates of the governors should be proved to have been false and fraudulent. The opinion of the court further says, that the facts stated in the pleas are manifestly true; that it is extremely improbable, under the circumstances, that the defendants Weill and Cahn had notice of the falsity of the certificates ; and that, admitting that their falsity might be shown, in conjunction with notice to the defendants of that fact, it would be extremely difficult, in view of the lapse of time and of the absence of any resident population along the line of the road at the time, to make any satisfactory proof on the subject. The opinion then refers, as an authority applicable to the cases generally, to the opinion of Judge Sawyer in No. 1218, *United States* v. *Dalles Military Road Co.*, 41 Fed. Rep. 493.

For the reasons hereinbefore set forth in regard to case No. 1218, we are of opinion that the United States were entitled, on the sustaining of the pleas in the present case, to take issue as to the matters of fact alleged in them ; and that the decrees in No. 1248 must be reversed, in so far as they dismiss the bill as to the defendants who put in pleas, and the case be remanded with a direction to allow the plaintiffs to reply to and join issue on the pleas.

All of the eight suits here involved were commenced by the Attorney General in the name of the United States, under the authority and direction of an act of Congress passed March 2, 1889, 25 Stat. 850, which directed him to bring suits in the name of the United States in the Circuit Court of the United States for the District of Oregon, against all persons, firms and corporations claiming to own or to have an interest in the lands granted to the State of Oregon by the acts of Congress of July 2, 1864, July 5, 1866, and February 25, 1867, giving their titles, "to determine the questions of the seasonable

and proper completion of said roads in accordance with the terms of the granting acts, either in whole or in part, the legal effect of the several certificates of the governors of the State of Oregon of the completion of said roads, and the right of resumption of such granted lands by the United States, and to obtain judgments, which the court is hereby authorized to render, declaring forfeited to the United States all of such lands as are coterminous with the part or parts of either of said wagon roads which were not constructed in accordance with requirements of the granting acts, and setting aside patents which have issued for any such lands, saving and preserving the rights of all *bona fide* purchasers of either of said grants, or of any portion of said grants, for a valuable consideration, if any such there be. Said suit or suits shall be tried and adjudicated in like manner and by the same principles and rules of jurisprudence as other suits in equity are therein tried, with right to writ of error or appeal by either or any party as in other cases."

By this act, suits are directed to be brought to determine (1) "the question of the seasonable and proper completion of said roads in accordance with the terms of the granting acts, either in whole or in part;" (2) "the legal effect of the several certificates of the governors of the State of Oregon of the completion of said roads;" (3) "the right of resumption of such granted lands by the United States;" (4) to obtain judgments, which the court is thereby authorized to render, "declaring forfeited to the United States all of such lands as are coterminous with the part or parts of either of said wagon roads which were not constructed in accordance with requirements of the granting acts;" and (5) to set aside patents which have been issued for any such lands, "saving and preserving the rights of all *bona fide* purchasers of either of said grants, or of any portion of said grants, for a valuable consideration, if any such there be."

It is manifest that, although the act says that the suits are to be tried and adjudicated in like manner and by the same principles and rules of jurisprudence as other suits in equity, Congress intended a full legal investigation of the facts, and

did not intend that the important interests involved should be determined upon the untested allegations of the defendants. They set up, to avoid an actual investigation, staleness of claim, estoppel, laches, the certificates of the governors, and allegations of *bona fide* purchase. It must be held that, in passing the statute of 1889, Congress gave full effect to its three granting acts and to its act of June 18, 1874, to the reports made by its committees and to the acts and proceedings of the Secretary of the Interior, the Commissioner of the General Land Office and other executive officers. An assertion that the claim of the United States is a stale claim is an assertion that Congress deliberately directed suit to be brought upon a stale claim. If laches be a good defence, it must be declared that Congress directed suits which would be defeated by showing prior delays by Congress. Besides, the defences of stale claim and laches cannot be set up against the government. *United States* v. *Kirkpatrick*, 9 Wheat. 720; *United States* v. *Van Zandt*, 11 Wheat. 184; *United States* v. *Nicholl*, 12 Wheat. 505; *Dox* v. *Postmaster General*, 1 Pet. 318; *Lindsey* v. *Miller*, 6 Pet. 666; *Gibson* v. *Chouteau*, 13 Wall. 92; *Gaussen* v. *United States*, 97 U. S. 584; *Steele* v. *United States*, 113 U. S. 128; *United States* v. *Insley*, 130 U. S. 263.

The government has had no opportunity to prove the charges of fraud made in the bill, and there is no proof but the allegations of the pleas as to the *bona fides* of the defendants, and as to the amounts expended by them in good faith in connection with the roads or the lands. It cannot be properly held that, under the act of 1889, final adjudication can be made, on such pleadings alone, as to the extensive interests involved in this litigation. The claims of the United States cannot be treated as stale claims, in view of the act of 1889, especially as to those portions of the lands which remain unpatented, and as to those certificates of the governors which were false and fraudulent to the knowledge of those who made them and to the knowledge of the several defendants, or in view of the alleged defects of the certificates in cases Nos. 1219 and 1248.

Cases Nos. 1444, 1445, 1446, 1447 and 1448 arose out of transactions under the acts involved in No. 1218, namely, the

act of February 25, 1867, (14 Stat. 409,) and the act of the State of Oregon of October 20, 1868, granting the lands covered by said act of Congress to the Dalles Military Road Company. In No. 1444, the defendant Kelly is a grantee of the road company, and in the four other cases the defendants Cooper, Rogers's administratrix, Grant and Floyd, are grantees respectively of the Eastern Oregon Land Company, which derives its title from the road company. In each of the bills of complaint in Nos. 1444, 1445, 1446, 1447 and 1448 the allegations are in substance the same-as those of the bill in No. 1218, with the further allegation, that the defendants respectively entered into possession of some of the lands under deeds, and claim severally to own and hold them adversely to the United States, and had the full knowledge charged against the defendants in the bill in No. 1218.

In each of the four cases, Nos. 1444, 1445, 1447 and 1448, (those against Kelly, Cooper, Grant and Floyd,) a stipulation was entered into between the parties, on November 5, 1889, that the defendant need not further plead until the determination of the pleas in the suit of the United States against the Eastern Oregon Land Company, (that is, No. 1218,) or until the further order of the court. The decree in No. 1218, dismissing the bill, was made February 18, 1890. On May 5, 1890, a general demurrer to the bill for want of equity was interposed in each of the four cases, Nos. 1444, 1445, 1447 and 1448; and in No. 1446, on the 30th of April, 1890, a demurrer to the bill was filed for want of equity and on the ground that the heirs of Alexander Rogers, deceased, were necessary parties to the bill. On May 2, 1890, a decree sustaining the demurrer and dismissing the bill was entered in No. 1446, and on May 7, 1890, a decree sustaining the demurrer and dismissing the bill was entered in each of the other four cases.

The prayers of these five bills are that the certificates, patents and deeds be declared fraudulent and void and the lands be restored to the public domain, and for general relief.

It is apparent that the decision on the pleas in No. 1218 was regarded as determining these five suits, and that, as the decree in No. 1218 is reversed, the decrees in these five

suits must also be reversed, and such further proceedings be had in them as shall not be inconsistent with the opinion of this court in No. 1218, so that these five suits may proceed *pari passu* with No. 1218, and the United States be entitled to have the full benefit of the act of 1889 in all the suits.

As to the ground of demurrer stated in No. 1446, that the heirs of Alexander Rogers, deceased, are shown by the bill to be proper and necessary parties, the deed from the Eastern Oregon Land Company is to the defendant Matilda C. Rogers, "administratrix, in trust for the estate of Alex. Rogers, deceased," and the conveyance is "to her, her heirs and assigns forever" The bill does not state that Alexander Rogers left any heirs. It only misstates the contents of the deed, a copy of which is annexed to the bill, by stating that the conveyance was to "Matilda C. Rogers, administratrix of the estate of Alexander Rogers, in trust for said estate and the heirs of said deceased," which is an incorrect statement of the deed.

To prevent any misapprehension, we state that

*We do not intend to determine any question as to the controversy between the United States and the claimants of the lands, but reverse the cases that their merits may be investigated. Decrees of this court will be entered in accordance with the foregoing directions.*

*Reversed.*