ELECTRICAL RESEARCH PRODUCTS, INC.,

Defendant Below, Appellant,

*vs.*

THE VITAPHONE CORPORATION,

Complainant Below, Appellee.

*Supreme Court, On Appeal, Feb. 6, 1934.*

418

LAYTON, C. J., HARRINGTON, RICHARDS, RODNEY, and REINHARDT, JJ., sitting.

RODNEY, J., dissenting in part.

*Christopher L. Ward, Jr.,* of the firm of Marvel, Morford, Ward & Logan, and *G. F. Hurd,* of New York City (*J..H. Ray,* of New York City, of counsel), for appellant.

*Hugh M. Morris, George Wharton Pepper,* of Philadel-

phia, Pa. (*Robert W. Perkins,* of New York City, and *Theodore S. Paul,* of Philadelphia, Pa., of counsel), for appellee.

HARRINGTON, J., delivering the opinion of the majority of the Court:

There are two possible questions to be considered in this case:

1. Can an appeal be taken from the decision of the court below, overruling the plea of Electrical Research Products, Incorporated, respondent below, to the complainant's bill?

2. If an appeal will lie from that decree, was the plea properly overruled by that court?

The right of appeal from the Court of Chancery is regulated by *Section* 12, *Article* 4, of the *Constitution of* 1897, which provides:

"The Supreme Court shall have jurisdiction as follows:

"(1) To issue writs of error to the Superior Court and to determine finally all matters in error in the judgments and proceedings of said Superior Court. * * *

"(4) To receive appeals from the Court of Chancery, and to determine finally all matters of appeals in the interlocutory or final decrees and to proceedings in Chancery."

Substantially the same language was also used in the *Constitution of* 1831 (*Section* 7, *Art.* 6), which provided:

"The court of errors and appeals shall have jurisdiction to issue writs of error to the Superior Court, and to receive appeals from the Court of Chancery, and to determine finally all matters in error in the judgments and proceedings of said Superior Court, and all matters of appeal in the interlocutory or final decrees and proceedings in Chancery."

Slightly different language appeared, however, in the *Constitution of* 1792 (*Section* 1, *Art.* 7). The corresponding clause there was:

"There shall be a court styled 'The high court of errors and appeals.' * * * This court shall have power to issue writs of error to the Supreme Court, and to the court of common pleas, and to receive and determine appeals from interlocutory or final orders or decrees of the Chancellor."

Influenced by common law rules, there was originally an apparent inclination in this State to construe *Paragraph* 1, *Section* 12, *Article* 4, of the *Constitution of* 1897 somewhat strictly (*Jeans v. Jeans,* 3 *Har.* 136) ; but subsequent decisions have shown a more liberal tendency. *Thompson v. Thompson,* 3 *W. W. Har.* (33 *Del.*) 593, 140 *A.* 697; *State ex. rel. Brumley v. J. & M. Paper Co.,* 3 *Boyce,* 544, 90 *A.* 83; *Union Church v. Sanders,* 1 *Houst.* 104, 63 *Am. Dec.* 187; *Knight v. Ferris,* 6 *Houst.* 283.

Under the more recent rule, and in keeping with our practice and procedure, the word "proceedings," as used in that paragraph, is held to apply to proceedings, though unlike judgments, not strictly of common law origin.

In analogy to the ancient practice in the English Courts of Law (*Daniell's Ch. Pl. & Pr.* [*5th Ed.*] 1492), under that provision of the Constitution, writs of error can only be taken from final judgments or from orders in the nature of final judgments in the other proceedings therein referred to. *Ownbey v. Morgan's Executors,* 7 *Boyce* 597, 105 *A.* 838; *Union Church v. Sanders,* 1 *Houst.* 104, 114, 63 *Am. Dec.* 187; *State ex rel. Brumley v. J. & M. Paper Co.,* 3 *Boyce,* 544, 90 *A.* 83; *Thompson v. Thompson,* 3 *W. W. Har.* (33 *Del.*) 593, 140 *A.* 697.

The rule applied in the English Courts of Law in ancient times did not, however, apply to appeals from decrees of the Court of Equity; and in that Court, it is clear that where rights were determined by such decrees, appeals could usually be taken from interlocutory or intermediate decrees, as well as from final decrees. 2 *Smith's Ch. Pr.* 39; 2 *Dan. Ch. Pl. & Pr.* (*5th Ed.*) 1459, 1462, 1463, *note,* 1491; *Dan. Ch. Pl. & Pr.* (*2d Ed.*) 1658; *Bissell Carpet Sweeper Co. v. Goshen Sweeper Co.,* (*C. C. A.*) 72 *F.* 545; *Richmond v. Atwood,* (*C. C. A.*) 52 *F.* 10, 17 *L. R. A.* 615; *Forgay v. Conrad,* 6 *How.* 201, 205, 12 *L. Ed.* 404; *Thomson v. Wooster,* 114 *U. S.* 104, 112, *note,* 5 *S. Ct.* 788, 29 *L. Ed.* 105; *Cocke's Ad'mr. v. Gilpin,* 40 *Va.* (1 *Rob.*) 20.

In discussing this question Mr. Daniell in his work on *Chancery Pleading and Practice* (*5th Ed.*) 1462, *supra,* says—"Wherever the Court is called upon to determine a question of law, or of fact, the decision may be the subject of a rehearing, or appeal, by any party bound thereby, who considers himself aggrieved by it."

At page 1491 of the same work the same author also says—"Any person who feels himself aggrieved by a decree or order of the Court of Chancery is entitled, as a matter of right, to appeal to the House of Lords." But that rule did not apply to discretionary orders nor did it apply to mere decretal or procedural orders by which no real and substantive rights were determined. *Dan. Ch. Pl. & Pr.,* (*5th Ed.*) 1462, 1472; *Bissell Carpet Sweeper Co. v. Goshen Sweeper Co.,* (*C. C. A.*) 72 *F.* 545.

Perhaps we might also add that by statute, it seems that no appeal can now be taken in England from an interlocutory decree in equity without the leave of the court. *Section* 1 of the *Jud. Act of* 1895; *In re Jerome,* (1907) 2 *Ch. Div.* 145.

Since 1792 our Constitutions have provided for appeals from "interlocutory" decrees, as well as from "final" decrees in the Court of Chancery[1]; and for the purposes of this case, such provisions may be said to be little more than declaratory of the ancient English practice in appeals to the House of Lords. See *Newark, etc., R. Co. v. Newark,* 23 *N. J. Eq.* 515.

In fact, in *Tatem v. Gilpin,* 1 *Del. Ch.* 13, the old High Court of Errors and Appeals, in considering the right of appeal from the Court of Chancery, under the *Constitution of* 1792, said: "That the words 'interlocutory order or decree' in the Constitution must be taken in a technical sense, and that the right of appeal is not enlarged but secured by the Constitution."

True, the court in *Union Church v. Sanders,* 1 *Houst.* 100, 63 *Am. Dec.* 187, in which the right to a writ of error from the Superior Court was involved, did say that the language used in the *Constitution of* 1831 placed "the judgments and proceedings of that Court upon original and on other than the common law grounds"; but the meaning of the word "proceedings" was then being considered.

As we have already pointed out, the language used in the *Constitution of* 1792 is slightly different from that used in both the *Constitutions of* 1831 and 1897. Under that Constitution, the appellate court was authorized to "determine appeals from interlocutory or final orders or decrees of the Chancellor."

---

[1] Certain statutory provisions relating to appeals from interlocutory decrees of the Court of Chancery have been in existence in the State since before 1831. *Sections* 4686, 4687, *Revised Code* 1915. The same is, also, true of *Section* 4688 of the same Code which was, however, amended in 1933 by *Chapter* 204, *Vol.* 38, *Laws of Del.* See, also, *Rules* 67, 68 and 94 of the Court of Chancery, which rules were revised in 1917.

By the terms of the *Constitution of* both 1831 and 1897, the appellate court was authorized to "determine   \*  \*  \* all matters of appeal in the interlocutory or final decrees and proceedings in Chancery."

A note inserted by Chancellor Bates to *Tatem v. Gilpin*, 1 *Del. Ch.* 13, pointed out that this language of the *Constitution of* 1831 had never been construed. Referring to this note, the court, in *Newlin v. Phillips, 9 Del. Ch.* 165, 80 *A.* 640, without expressly deciding the question, strongly intimated that the insertion of the words "all matters of appeals," in the section in question, in both the *Constitutions of* 1831 and 1897, had a limiting effect on the right of appeal therein provided for. As we view it, however, these words were merely inserted for the purpose of clarity and made no material difference in the meaning of those sections; nor do we attach any particular significance to the omission from the *Constitutions of* 1831 and 1897 of the word "orders," as used in the *Constitution of* 1792.

A plea in equity is, in effect, merely an answer to the complainant's bill, or to some part of it, on a single issue. 1 *Harrison's Chan.* 355; *Daniell's Chan. Pl. & Pr.,* (5*th Ed.*) 603, 607, 611; *Wampum Oil Corporation v. Lago Petr. Corporation, 19 Del. Ch.* 45, 163 *A.* 622. Its purpose is to save the expense and delay incident to a trial on all the issues that may be involved in the case and that would be raised by a general answer. *Dan. Ch. Pl. & Pr.,* (5*th Ed.*) 603, 604; *Langdell on Eq. Pl.* 100.

Under our practice, the legal sufficiency of a plea in equity is determined by setting it down for argument under *Rule* 47 of the equity rules. The same was true under the old English Chancery practice (*Dan. Ch. Pl. & Pr.* [5*th Ed.*] 692), and that procedure was adopted in this case.

When a plea is set down for argument, as on a demurrer, the truth of the facts alleged in it is admitted, and the court, on those facts, and on the issue raised thereby usually makes an order or decree sustaining or overruling it. *Langdell on Eq. Pl.* 109; see, also *Davison's Executors v. Johnson,* 16 *N. J. Eq.* 112.

If it is held to be insufficient and is overruled, as in this case, the respondent must make a new defense. This may be done by a new plea, but he is usually ordered to answer (*Lang. Eq. Pl.* 109; *Dan. Ch. Pl. & Pr.* [*5th Ed.*] 702) ; and when a plea is overruled on its merits, the same defense cannot ordinarily be set up again in the answer. *Dan. Ch. Pl. & Pr.,* (*5th Ed.*) 702, and *note.*

In *Thompson v. Thompson,* 6 *Houst.* 225, the court held that an order permitting the changing of an information filed by the attorney general, to a bill, was not an interlocutory decree that could be appealed from, but was merely an order made in the usual course of the practice of the court. See, also, *Dan. Ch. Pl. & Pr.,* (*5th Ed.*) 1462, *note.*

In *Newlin v. Phillips,* 9 *Del. Ch.* 165, 80 *A.* 640, the court, without expressly deciding the question, also, intimated that an order overruling a demurrer to a bill was in the same class, and not subject to an appeal. The bill in question was filed to remove a cloud on the title of certain real estate standing on the records in the name of the respondent, but because of the terms of a will, and of certain other facts set forth in the bill, alleged to belong in equity to the complainants.

Largely based on that case, the respondent contends that the order of the court below, in overruling the plea in this case, was not an interlocutory decree within the meaning of that term, but a mere procedural or decretal order that is not subject to appeal.

The dictum in *Newlin v. Phillips, supra,* is, however, inconsistent with the procedure taken in *Fed. Min. & Smelt. Co. v. Wittenberg,* 15 *Del. Ch.* 409, 138 *A.* 347, 55 *A. L. R.* 1. True, in that case the right of the appellant was not questioned, but an appeal was taken from the order entered by the court below in disposing of a demurrer to the complainant's bill on the merits of the case alleged in it; and such appeal was heard and disposed of by this court. Whether that procedure was consistent with the Old English Chancery practice need not be considered by us in this

case but see *Dan. Ch. Pl. & Pr.*, (*5th Ed.*) 597, *note*, 599, 1460, 1472; 2 *Smith's Ch. Pr.*, 37.

In *Bissell Carpet Sweeper Co. v. Goshen Sweeper Co.*, (*C. C. A.*) 72 *F.* 545, 554, the court said: "A preliminary order, by which no question is determined upon the merits, and no right established, is termed a 'decretal order,' in distinction to an interlocutory decree by which something touching the merits is adjudged."

The term "decree" has, also, been said to include an order settling some right or liability pertaining to the substance of the controversy as distinguished from a mere general, or special direction, by which the suit is governed, controlled, or facilitated in the course of its progress. 21 *C. J.* 642; see, also, 10 *R. C. L.* 553.

It may be difficult in some cases to apply these rules, but in *Bouvier's Law Dictionary*, (*Rawle's 3d Ed.*) 803, in considering the difference between an interlocutory decree and a final decree, the author aptly says: "That the former is entered on some plea or issue arising in the cause which does not decide the main question; the latter settles the matter in dispute." In connection with the first proposition stated in this quotation see also *Dan. Ch. Pl. & Pr.*, (*5th Ed.*) 1459, *etc.*, 1472, 1491, 1492.

The plea filed by the respondent in the court below did not answer on its merits the matters contained in the bill filed, but it did raise an issue of law on a material and substantial question which was decided by the court at an intermediate stage of the case. An issue, which had the plea been sustained, and assuming the correctness of the facts alleged, would have been a complete bar to the complainant's case. That decree established legal rights and was, therefore, not a mere decretal order but an interlocutory decree that was subject to an appeal by the provisions of the Constitution.

The general principle above stated was held to be the test of the right of appeal in *Tatem v. Gilpin*, 1 *Del. Ch.* 13, *supra*.

In that case, the old High Court of Errors and Appeals held that an appeal would lie from an order directing the issuance of an injunction which determined substantive rights and was, therefore, more than suspensive in its nature. See, also, *Dan. Ch. Pl. & Pr.,* (*5th Ed.*) 1493, *note,* 1469, *note.*

The court, also, said, however, that an order for an *"injunction pendente lite"* could not be appealed from, if it be such an order as a court of equity, according to its established rules, could issue.

Other reported cases in this State are in harmony with this general rule. *Tharp v. Fleming,* 1 *Houst.* 580; *Bodell v. General Gas & Elec. Co.,* 15 *Del. Ch.* 420, 140 *A.* 264; *Penington v. Commonwealth Hotel, etc., Corp.,* 17 *Del. Ch.* 394, 155 *A.* 514, 75 *A. L. R.* 1136; *Harned v. Beacon Hill Real Estate Co.,* 9 *Del. Ch.* 411, 84 *A.* 229; *Gott v. Live Poultry Transit Co. (Catholic Bishop of Chicago v. Mudd)* 17 *Del. Ch.* 442, 161 *A.* 150; see, also, *Fed. Min. & Smelt. Co. v. Wittenberg,* 15 *Del. Ch.* 409, 138 *A.* 347, 55 *A. L. R.* 1.

The plea, among other things, alleges that the parties hereto entered into three several, but related, contracts in the State of New York in May, 1927; that such contracts were to be performed in that State, and by their express provisions were to be construed according to the laws of the State of New York; that each of these contracts contained clauses whereby it was agreed that all controversies that might arise under them should be settled by arbitration; that a New York statute, enacted prior to the execution of these contracts, makes arbitration contracts valid, irrevocable and enforceable, and that all of the matters referred to in the complainant's bill, and upon which the remedy it seeks is predicated, grow out of the 1927 contracts.

The respondent, therefore, contends that the arbitration clauses of these contracts irrevocably bind the parties to them, not only in the State of New York, but elsewhere,

and that its plea should have been sustained by the court below.

This contention is based on the theory that the New York statute, and the contracts based thereon, relate to material and substantive rights, and that such rights are not only protected under the full faith and credit clause (*Article 4, § 1*) and the due process clause (*Fourteenth Amendment* · of the *Federal Constitution*, but, also, by the rule of comity between states.

A contract, providing for arbitration, merely provides a remedy for the settling of disputes. In this connection, Judge Cardozo, in his concurring opinion, in *Meacham v. Jamestown, F. & C. R. Co.*, 211 *N. Y.* 346, 105 *N. E.* 653, 655, *Ann. Cas.* 1915C, 851, said:

"An agreement that all differences arising under a contract shall be submitted to arbitration relates to the law of remedies, and the law that governs remedies is the law of the forum. \* \* \* Such a contract, whatever form it may assume, affects in its operation the remedy alone."

The same rule applies, though by the terms of a statute arbitration contracts are made both irrevocable and enforceable. This is well settled in the State of New York, in the Federal courts sitting in that State, and elsewhere. *Marchant v. Mead-Morrison F. G. Co.*, 252 *N. Y.* 284, 169 *N. E.* 386; *Gilbert v. Burnstine*, 255 *N. Y.* 348, 174 *N. E.* 706, 73 *A. L. R.* 1453; *Atlantic Fruit Co. v. Red Cross Line*, (*C. C. A.*) 5 *F.* (*2d*) 218; *Red Cross Line v. Atl. Fruit Co.*, 264 *U. S.* 109, 124, 44 *S. Ct.* 274, 68 *L. Ed.* 582; *California Prune & Apricot Growers' Asso. v. Catz Amer. Co.*, (*C. C. A.*) 60 *F.* (*2d*) 788, 85 *A. L. R.* 1117; *Marine Transit Corp. v. Dreyfus*, 284 *U. S.* 263, 52 *S. Ct.* 166, 76 *L. Ed.* 282; *Lappe v. Wilcox*, (*D. C.*) 14 *F.* (*2d*) 861.

In *Berkovitz v. Arbib, et al.*, 230 *N. Y.* 261, 130 *N. E.* 288, 290, suit was brought on a New York contract, after the enactment of the arbitration statute of that State. The contract in question was made before the statute was passed,

and the fact that it contained a clause providing for the arbitration of dispute, arising under it, was pleaded in bar of the plaintiff's action.

In considering the effect of the statute, Judge Cardozo, after reiterating his previous statement, that arbitration was merely a form of procedure for the settlement of differences, also, added: "It is not a definition of the rights and wrongs out of which differences grow. This statute did not attach a new obligation to sales already made. It vindicated by a new method the obligation then existing." That being true, *Bradford Electric Light Co. v. Clapper,* 286 *U. S.* 145, 52 *S. Ct.* 571, 76 *L. Ed.* 1026, 82 *A. L. R.* 696, has no application to this case. The contract therein referred to was of statutory origin, but it clearly affected substantive rights, and not mere matters of procedure. Substantive contractual rights were, also, involved in *Home Ins. Co. v. Dick,* 281 *U. S.* 397, 50 *S. Ct.* 338, 74 *L. Ed.* 926, 74 *A. L. R.* 701.

Under the common law rule, it was well settled that an agreement to arbitrate could not be pleaded in bar of an action brought unless an award had been made, and such contract was no longer executory. *Matter of Berkovitz v. Arbib, et al.,* 230 *N. Y.* 261, 130 *N. E.* 288; *President, etc., of Del. & Hudson Canal Co. v. Pa. Coal Co.,* 50 *N. Y.* 250; *Story's Eq. Jur.,* § 1900; 5 *C. J.* 20, 42, 53.

Nor would a court of equity order such a contract to be specifically performed. *Miles v. Schmidt,* 168 *Mass.* 339, 47 *N. E.* 115; *Tobey v. County of Bristol, Fed. Cas.* 14,065, 3 *Story,* 800; *Story's Eq. Jur.,* § 1900.

In other words, though a contract providing for arbitration was entered into, there was no way of compelling the parties to specifically carry out that contract; and so far as performance was concerned, it could be repudiated by either party at any time before the award was made. *Matter of Berkovitz v. Arbib, et al.,* 230 *N. Y.* 261, 130 *N. E.* 288; *Pres., etc., of Del. & Hudson Canal Co. v. Pa. Coal Co.,* 50 *N. Y.* 250; 5 *C. J.* 20, 42, 53. In fact, this was

apparently the rule whether the agreement was to submit all future disputes that might arise between the parties to arbitration, or whether existing disputes were the only ones covered by the contract. 5 *C. J.* 20, 42; *Randel, Jr., v. Ches. & Del. Canal Co.,* 1 *Harr.* 233, 275.

This was because a contract to oust the courts of their jurisdiction, and thereby to prevent a person from appealing to them for aid, was held to be contrary to settled principles of public policy. *Matter of Berkovitz v. Arbib, et al.,* 230 *N. Y.* 261, 130 *N. E.* 288; *Story's Eq. Jur.,* § 1900; 5 *C. J.* 53. Though such a contract could not be specifically enforced, it was not absolutely void, but could be sued on by the injured party. 2 *Green. on Evid.,* § 79; 5 *C. J.* 42, 43, *note,* 53. In most cases, however, nothing more than nominal damages could be recovered by the plaintiff for the defendant's breach of such a contract. 3 *Willist. on Contr.,* § 1927. The same general principles have long been the settled rule in this State.

In *Randel, Jr., v. Ches. & Del. Canal Co.,* 1 *Harr.* 233, 275, in considering a demurrer to a plea in an action at law, the court said: "And we understand the law to be settled, that a prospective agreement to refer all matters in dispute which may hereafter arise cannot be shown as a defense to an action for the recovery of such disputed matter, for the superior courts will not suffer themselves to be ousted of their jurisdiction by the private agreement of the parties. 1 *Wils.* 129; 8 *T. Rep.* 139; 2 *Ves. Jr.* 129; *Mitchell v. Harris,* 2 *Bos. & Pul.* [2 *Ves. Jr.*] 131; 2 *Atk.* 569; 2 *Bro. Ch. Cas.* 336; 1 *Saund. Pl. Ev.* 177, 179.

"This is not the case of a reference actually depending, or of a reference made and determined. Even in the case of a clear submission of existing disputes either party has a right to revoke the submission. It is true he is answerable on his agreement to submit; but after the revocation this would be no defense in an action to recover the disputed matter. His only liability is on his agreement to abide by the reference; if he violates that agreement it is not a

defense to an action for the thing disputed." See, also, *Fooks v. Lawson*, 1 *Marv.* 115, 40 *A.* 661; *Crumlish v. Wil. & West. R. Co.*, 5 *Del. Ch.* 270; *Stewart v. Grier*, 7 *Houst.* 378, 32 *A.* 328.

Though an arbitration contract is not illegal, to hold such a contract irrevocable and enforceable in this State, on grounds of comity, and in accordance with the respondent's plea, would, therefore, seem to be contrary to well established rules of policy.

This conclusion is not inconsistent with *Hamlin & Co. v. Talisker Distillery, L. R.* (1894) *Peerage Cas.* 202.

In that case, the contract sued on was made in London, but one of the parties to it lived in Scotland, and the contract was to be performed in that country. It provided, however, that any disputes that might arise under it should be settled by arbitration by two members of the London Corn Exchange, or their umpire, in the usual way.

An English statute (*Act of* 1889, 52 and 53 *Vict.*) made arbitration contracts irrevocable and enforceable; and this provision of the contract was valid in that country. Whether by statute, or otherwise, did not appear, but arbitration contracts were, also, enforceable in Scotland, though the arbitrators had to be named in the contract. Suit was brought by the Scotch parties to the contract in Scotland, and the English party, by plea, set up the arbitration clause. The Scotch court held the plea bad. On appeal to the English House of Lords, that court was reversed on the ground that arbitration contracts were enforceable in both countries, and though there were slight differences in procedural details there was no real and essential difference in the policy of the two countries. It, therefore, held that the arbitration clause of the contract was enforceable in Scotland.

This is, however, an appeal from a decree of the Court of Chancery, and whether the facts are such as to justify the complainant in asking for relief from that court may be another matter.

Where questions of rights and remedies in a court of equity are involved, we must bear in mind that the facts must be such as to fairly and justly entitle the complainant to the relief sought by it.

This well established principle is embodied in the maxim that a complainant is entitled to no relief in a court of equity unless he comes in with "clean hands." *Sharpless-Hendler Ice Cream Co. v. Davis,* 17 *Del. Ch.* 161, 151 *A.* 261, 262; *Deweese v. Reinhard,* 165 *U. S.* 386, 17 *S. Ct.* 340, 41 *L. Ed.* 757; *General Excavator Co. v. Keystone Driller Co., (C. C. A.)* 62 *F.* (2*d*) 48. This case was, also, before the Supreme Court of the United States in 1933. 290 *U. S.* 240, 54 *S. Ct.* 146.

In *Deweese v. Reinhard,* 165 *U. S.* 386, 17 *S. Ct.* 340, 341, 41 *L. Ed.* 757, *supra,* the court aptly said: "A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."

As was, also, said by the Chancellor in *Sharpless-Hendler Ice Cream Co. v. Davis, supra,* "It (the doctrine of unclean hands) is a rule that lays restrictions upon complainants, and tells them that an appeal for relief to a court of conscience will not be honored by one who has himself been guilty of unconscionable conduct."

Precisely the same thought was, also, expressed in *Weegham v. Killefer, (D. C.)* 215 *F.* 168, 171, to the effect that "any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean." See, also, *Pomeroy's Eq. Juris., (5th Ed.)* 397, 404.

The old rule that a contract to arbitrate disputes could not be enforced, applied in courts of equity, as well as in courts of law. *Story's Eq. Jur.,* § 1900; 3 *Willist. on Contracts,* § 1719.

The English courts, at times, severely criticized that rule and hedged it around with limitations and exceptions relating to distinctions between promises that were collateral and those that were conditional, but where the facts made it absolutely necessary to apply it, the old rule, nevertheless, survived in that country until the enactment of the statute (*Act of* 1889, 52 and 53 *Vict.*). *Matter of Berkovitz v. Arbib, et al.*, 230 *N. Y.* 261, 130 *N. E.* 288; *Pomeroy's Specific Performance of Contracts*, 150, 151, 309; see, also, *Story's Eq. Jur.* 1053, *note.*

The courts of equity in that country have, however, been extremely assiduous in finding reasons for not applying the old rule in particular cases. This is true in cases of bills filed for the specific performance of contracts for the sale of property where the purchase price was, by the terms of the contract, to be fixed by arbitration.

In these cases, even though that clause was not complied with, they have frequently held it to be merely collateral or incidental to the main object of the contract, and have, therefore, ascertained the proper value of the property to be sold, and decreed specific performance. *Pomeroy's Specific Perf. of Contracts*, §§ 309 and *note*, 151.

In the last century, in harmony with this attitude and applying the general principle of "unclean hands," the English Courts of Chancery have refused relief to a complainant, who, without good cause, had repudiated an agreement to arbitrate. *Pope v. Lord Duncannon*, 59 *Eng. Rep.* 326 (1838) ; *Harcourt v. Ramsbottom*, 37 *Eng. Rep.* 460 (1820).

In *Pope v. Lord Duncannon, supra*, a bill was filed to restrain the respondent from taking possession of certain property and tearing down the buildings erected thereon. The complainant was the owner of that property but had agreed to sell it to the respondents. By the contract of sale, the purchase price was, however, to be fixed by arbitration. The arbitrators were agreed upon and had taken steps to ascertain the value of the property covered by the contract of sale, but before they had reached a conclusion the submission was revoked by the complainant.

Neither the bill, nor the affidavit in support of it, stated the complainant's reasons for revoking the authority of the arbitrators. The affidavit merely stated that the complainants considered that they had good grounds for being dissatisfied with their conduct. The court conceded that the revocation of the authority of the arbitrators was good at law, but said that if the contract was revoked without just and reasonable grounds, a court of equity ought not to give any relief.

In discussing this question, it said: "A plaintiff is not at liberty to ask aid of a court of equity, in respect to an act done by him against good faith. And, as in this case, there is nothing to show that the power which the plaintiffs had given to the arbitrators was revoked upon any just or reasonable grounds, I am bound to conclude that the revocation was a wanton and capricious exercise of authority on their parts, and consequently the motion must be refused."

In *Harcourt v. Ramsbottom, supra,* a deed was made to secure certain debts due from the complainant, a country banker, to the respondents, its London agents, for bills accepted and moneys advanced. A jury had previously rendered a verdict in favor of the respondents for something in excess of 29,000 pounds, but according to the agreement of the parties the exact balance due, after adjusting the accounts between them, was to be ascertained by an arbitrator, and if that amount was not paid in a specified time, the respondents, the grantees, were authorized to sell the property described in the deed, for the collection of their debt.

The arbitrator named held several meetings, and finally ascertained that 30,966 pounds were due from the complainant to the respondents. Before the balance was ascertained and the award made, the complainant, by deed, revoked his authority; but the arbitrator, nevertheless, made an award. The property described in the deed was subsequently advertised for sale, and a bill to restrain such sale was filed by the grantor on the ground that the award made

by the arbitrator was without authority, and illegal. Lord Eldon, however, refused to give any relief to the complainant. True, he pointed out that the case had been tried on the theory that the complainant was indebted to the respondents. He said: "It is said the award is not good because the authority was revoked; my answer is that if it is revoked at law, I could not have considered it as revoked in equity, whether it was made a rule of court, or not. If the award was not enforced, this court would leave the parties to deal with the matter at law; and if, at law, you can restrain them from selling those estates, do it; but you have no equity to come here. Supposing the revocation to be good in law, this was a case in which a court of equity would not act." The same general principle has either been applied or recognized in *Toledo S. S. Co. v. Zenith Transp. Co.*, (C. C. A.) 184 *F.* 391; *Lasar v. Baldridge*, 32 *Mo. App.* 362; *Ellington & Guy v. Currie*, 193 *N. C.* 610, 137 *S. E.* 869.

There are cases in America that recognize the early English rule, applied even in equity, that an arbitration contract can be repudiated by either party, though without good cause shown, at any time before award made (*Tobey v. County of Bristol, Fed. Cas.* 14,065, 3 *Story* 800; *Wood v. Humphrey*, 114 *Mass.* 185; *Rosenblum v. Springfield, etc., Co.*, 243 *Mass.* 111, 137 *N. E.* 357; see, also, *Crumlish v. Wil. & West. R. Co.*, 5 *Del. Ch.* 270), but, where the facts justify it, we prefer to follow the more modern rule applied in England.

This rule, and the doctrine of "unclean hands," upon which it is based, would not apply, however, if a contract to arbitrate was not repudiated arbitrarily and unreasonably, and, therefore, without good and sufficient cause.

By reason of that fact, the complainant attempts to justify its failure to abide by its contract to arbitrate the pending disputes in this case, and its appeal to the court below for relief, by the contention that the arbitration proceedings have broken down, and have absolutely failed to accomplish their purpose.

This contention is based on two grounds:

1. Because of the great expense and delay in disposing of disputes in proceedings that were started in 1928, and which involved claims amounting to several million dollars.

2. Because Mr. Hogan, like Mr. Untermyer, has resigned as an arbitrator, and if those proceedings are to continue, the great mass of testimony already taken before him would, therefore, have to be reheard by a new arbitrator, appointed to succeed him.

An analysis of the facts alleged in the plea shows that Mr. Untermyer, the first arbitrator named by the complainant, resigned on April 11, 1930, after 32 sessions of the Arbitration Board, as then constituted, had been held, and a great mass of testimony had been taken.

The fair inference from these allegations, however, is that a large part of the matters in controversy before him were settled by the parties soon after his resignation. At any rate, on April 15, 1931, the complainant agreed to continue the arbitration proceedings, and designated Mr. Hogan, a Washington lawyer, who was largely engaged in the trial of cases involving complicated issues, as its arbitrator to succeed Mr. Untermyer.

At a subsequent date, the complainant made certain other procedural agreements connected with the arbitration, and also by agreement with the respondent was permitted to file a supplement to the first claim relied on by it.

On April 15, 1932, for the convenience of Mr. Hogan, the new arbitrator selected by the complainant, and because business engagements required his presence in California, an adjournment of the arbitration hearings was taken until May 17, 1932. No definite word as to when Mr. Hogan would return to the East had been received, so by agreement of counsel a further adjournment of the proceedings was taken until May 24, 1932.

On May 15, 1932, word was received from Mr. Hogan that he would return to Washington about the middle of June, 1932, whereupon a further adjournment of the proceedings was, by agreement, taken to June 14, 1932.

Because of the engagements of respondent's counsel, and also because of the impossibility of securing the attendance of its witnesses, it was agreed on June 9, 1932, that the June 14 hearing should not take place.

On June 9, 1932, complainant's counsel stated that they were then unable to definitely agree on a date on which the hearings might be resumed, but would communicate with respondent's counsel the next day.

On June 10, 1932, the complainants wrote each of the arbitrators requesting them to resign, and indicating their unwillingness to proceed with the submission.

As we have already indicated, they based this request on the long delay and expense in disposing of the matters in controversy. At that time, there had not only been 32 hearings before the original arbitrators, but also 30 hearings before the last Board, of which Mr. Hogan was a member, and a great mass of testimony had been taken before both of those Boards. In fact, it appears that 4,079 typewritten pages of testimony were taken before the last Arbitration Board.

By agreements of the parties, made subsequent to the original arbitration contracts, the arbitrators were to receive as compensation One Thousand Dollars ($1,000) per day, and expenses, and these expenses and those of the stenographer, who took the testimony, were in the first instance paid equally by the parties.

By reason of the complainant's agreement to arbitrate, and in connection with the proofs submitted by it in that proceeding, the respondents spent, in the way of counsel fees, arbitration fees, and stenographic and other expenses "directly and exclusively chargeable * * * to the arbitration proceedings" the enormous sum of $450,746.00; and it is expressly alleged that if this court should retain jurisdiction of this cause, all of these expenditures by the respondent would be a total loss to it.

In addition to this sum, the plea alleges that the respondent incurred other expenses, the precise amount of

which could not be ascertained, in the time and attention given by its executive officers and employees in preparation for and in attending the arbitration hearings. Perhaps we might add that the complainant, also, concedes that it has spent $300,000 in the same proceedings.

The precise time when Mr. Hogan could have resumed his arbitration duties does not appear from the plea filed. By agreement of counsel, however, certain letters from him were included in the record and are to be considered by us, as though they were included in the plea.

In Mr. Hogan's letter of August 11, 1932, from Washington, D. C., addressed to Mr. Hurd, one of the respondent's counsel, he stated that he intended to return to California on August 15, 1932, but that he planned to be in Washington the last half of September of that year. He further stated, however, that he would be unable to "give any consideration to a resumption of the arbitration hearings, if they are resumed, until after the middle of October"; and that he had not given any consideration to the complainant's request that the arbitrators resign.

In a subsequent letter from California to Mr. Hurd, dated August 26, 1932, Mr. Hogan said that he intended to leave California for Washington September 14, 1932, but would be engaged in other duties, in connection with sessions of the American Bar Association, for a few days subsequent to October 12, 1932. This letter was in reply to a letter from respondent's counsel, suggesting that the arbitration hearings be resumed after October 15, 1932.

The complainant's bill was filed in the court below on October 19, 1932, and on June 28, 1933, the plea filed by the respondent to that bill was overruled by that court, and the respondent was directed to answer.

It does not appear when Mr. Hogan returned to California, but by a letter written from there, dated July 10, 1933, and addressed to Mr. Hurd, Mr. Hogan acknowledged the receipt of a copy of the opinion of the court below, overruling the respondent's plea.

In that letter he said: "It is apparent to me that the arbitration, in which Messrs. Hiscock, Miller and myself are engaged, is at an end. Moreover, even if this were not so, I did not and could not contemplate, when I consented to act as one of the arbitrators, that the engagement would be an indefinite one. My professional engagements are many, and exceedingly important litigations will require the spending of considerable time in California. I am, therefore, to-day writing Mr. Thomas (the general counsel for Warner Brothers) and Judge Hiscock, advising that I consider myself relieved from any further obligation as an arbitrator. * * * Will you please consider this as a like request to Electrical Research Products, Inc.?"

A similar letter, bearing the same date, was also written to Mr. Thomas, general counsel for Warner Brothers, of which the complainant was a subsidiary.

It is apparent from the above facts that Mr. Hogan certainly had not resigned as an arbitrator on October 19, 1932, when the bill was filed in the court below, though that request was made of him in June of that year.

Further than that, his letters of July 10, 1933, were not until after the decree of the court below had been entered, and were clearly based on the fact that jurisdiction had been assumed by that court.

There were delays in concluding the arbitration proceedings, but some delays are always inevitable in proceedings of that nature where lawyers in active practice are selected as arbitrators, and the volume of testimony to be taken, as in this case, is great.

As a matter of fact, so far as the record shows, it seems that these delays were almost entirely caused by the arbitrators selected by the complainant.

From the allegations of the plea, or the concession of the parties, it would seem that Mr. Hogan was certainly in Washington from about June 15, 1932, until August 15, of that year, and also for all that appears, after about October 15, of the same year; but there is nothing to indi-

cate that the complainant had changed its attitude of June 10, when the resignation of all the arbitrators was requested by it.

It is clear that under the original contracts of May, 1927, the complainant agreed to arbitrate the matters in dispute covered by the allegations of its bill.

The resignation of Mr. Untermyer, after the mass of testimony had been taken before him, and the great expense incurred, is to be regretted; but even after that, the original arbitration contracts were, in effect, confirmed by subsequent agreements, and Mr. Hogan was appointed to take his place. There was a time limit for making the award in the original contracts, but if that limit ever applied to the subsequent contracts, it was waived by the parties.

How seriously the duties of Mr. Hogan were affected by other professional obligations, subsequently assumed by him, does not clearly appear, but we are not satisfied that the arbitration proceedings before him had absolutely broken down and become abortive either on October 19, 1932, when the bill was filed, or even after that date.

It appears from the complainant's letter of June 10, 1932, to the arbitrators, requesting their resignation, that the amount paid them, including their expenses, amounted to $105,159.54 and was, therefore, a substantial amount. One-half of these expenses were paid by the complainant, but these payments were in accordance with their express and voluntary agreement, and we can, therefore, base no relief on that ground.

As we have already pointed out, the arbitration contracts of May 18, 1927, were made in the State of New York and were to be performed in that State. They also contained clauses providing that they should be construed according to the laws of the State of New York; and by statute such contracts were irrevocable and enforceable in that State. These contracts were also repeatedly ratified in the State of New York by subsequent contracts to which the complainant was a party. Relying on these contracts,

the respondent collected and presented a great mass of testimony before the arbitrators named, and in defense of the claims made by the complainant against it. In the preparation and trial of its case, it also incurred tremendous expenses in the way of attorneys' fees and otherwise, which it alleges in its plea will be of no benefit, whatever, to it if the authority of the arbitrators to decide the case submitted to them is revoked.

In view of our conclusion that the arbitration proceedings in question have not broken down, so far as a court of equity is concerned, the complainant was not justified in repudiating the obligations providing for such proceedings and entered into by it; and, having done so, is entitled to no relief from this court. In addition to the cases cited, see 47 *Harv. Law Rev.* 126.

The facts supporting this conclusion appear in the respondent's plea, and for the purposes of this case are admitted by the complainant.

The same facts are, also, relied on in support of another contention made by the respondent, but that does not make the plea subject to the criticism that it raises more than a single issue.

The interlocutory decree of the court below, holding the respondent's plea insufficient, and directing it to answer the complainant's bill is, therefore, overruled. The complainant may, however, take issue on the facts alleged by filing a replication to the respondent's plea. *Dan. Ch. Pl. & Pr.* (5th Ed.) 692, 697; 21 *C. J.* 469; *Langdell's Eq. Pl.* 109; *U. S. v. Dalles Military Road Co.*, 140 *U. S.* 599, 11 *S. Ct.* 988, 35 *L. Ed.* 560; *R. I. v. Mass.*, 14 *Pet.* 210, 257, 10 *L. Ed.* 423; *Flagg v. Bonnel*, 10 *N. J. Eq.* 82; *Zimmerman v. So Relle*, (*C. C. A.*) 80 *F.* 417.

RODNEY, J., disagreed with that portion of the above opinion that held that the complainant below could not revoke its agreement to arbitrate the disputes pending between it and the respondent.

Motion for re-argument denied.