LittletoN, Judge,
delivered the opinion:
The plaintiff tribe of Indians seeks to recover the amount of an alleged deficiency in its accounts as a result of certain credits allowed and payments made by the defendant which, the plaintiff contends, were in terms of legal-tender notes rather than in gold, subsequent to the enactment of the legal tender act of February 25, 1862.
The plaintiff’s contention in substance is that with relation to the items in question the defendant’s officials accepted for the plaintiff, gave it credit, and distributed the funds upon a basis permitted by the existing law rather than upon the gold basis existing prior to the enactment of the legal tender act; that the defendant’s obligations, as a trustee, required it to administer the unexpended balance in its accounts on February 25,1862, on the basis of gold value, and that, therefore, *390 the defendant must now respond in an amount equal to the alleged loss of the premium value of gold in connection with certain items of the account.
The first claim is for $7,869.10, being the difference between the commercial value of a total of $46,080 in coin and the same amount in Treasury notes. This amount represented the value of 36 sections of land held in a separate fund in the United States Treasury, upon the approval of the legal tender act of February 25, 1862, to the credit of the Delaware Indians. This claim grows out of distributions in 1872, 1873, and 1875 of a portion of an existing fund set up in the treaty of 1829 for educational purposes among certain members of the tribe who had elected to terminate their membership in the tribe and to acquire citizenship, all as permitted and authorized by the treaty of July 4, 1866, and with relation to the distributions made to their children upon reaching the age of twenty-one years. The acts of July 15, 1870, 16 Stat. 335, and June 22, 1874, 18 Stat. 146, 175, made the necessary appropriations, all of which was accomplished. Neither of these acts appropriated or directed payment to the beneficiaries of any specific kind of money, and the record of the Government fails to show whether these disbursements were made in gold or in currency.
Plaintiff contends that the credit first given to the tribe in the fund was on the basis of gold and silver coin; that at the dates of distribution the defendant was accountable to the plaintiff in gold for the total sum on hand; that in the absence of evidence of the character of money used in the payment referred to, and the credits given it must be presumed that they were made in Treasury notes issued under the legal tender act of February 25, 1862, at which time gold was at a premium, and that there was, therefore, an actual profit to the account in 1872 and 1873 of $1,046.72, and in 1875 of $6,822.38, which belonged to the plaintiff tribe, which it is now entitled to recover with interest at 5 per cent from January 1, 1874, on the first-mentioned amount and from January 1, 1876, on the last-mentioned amount.
The second claim is for $5,646.38, being the difference between the commercial value of a total of $46,046.97 in coin and the same amount in Treasury notes. The third *391 ■claim is for $1,703.64, being the difference between the commercial value of a total of $6,286.51 in coin and the same amount in Treasury notes. These claims concern the balance of the principal on hand at the date of the enactment of the legal tender act and the interest thereafter received, growing out of the receipts from the sale of the plaintiff’s former reservation in Kansas, administered by the defendant under the provisions of the treaty of May 6, 1854. Cash annuities were distributed from this fund to the members of the plaintiff tribe and payments were made in connection with the construction and maintenance of the equipment at the agency on its reservation. The distributions to the members of the tribe were made in legal-tender notes, but the character of the money used in payment of repair bills does not appear. There was also credited to the fund certain payments received on the transfer of securities in which the plaintiff’s funds had been invested. The character of these moneys, whether gold, silver, or legal-tender notes, is not shown.
Plaintiff contends that the obligation of the defendant required it to receive and credit the payments for the lands in gold and silver and that its accountability for such payments must be on the same basis of value; that, having made ■certain disbursements with legal-tender notes, the defendant is required, in the absence of proof that other disbursements were upon the gold and silver basis, to account upon the assumption that they were made in legal-tender notes. It is insisted, therefore, that there was a profit to the account for which the defendant is now responsible to the plaintiff with interest.
The fourth claim is for $83,680.61, being the difference between the commercia] value of a total of $286,742.15 in coin and the same amount in Treasury notes. This claim grows out of a transaction for sale of a portion of plaintiff’s reservation in Kansas to the Leavenworth, Pawnee & Western Railroad Company as was first provided in the treaty of May 30, 1860, which, by its terms, provided for payment within a specified period of time of an ascertained value in gold and silver coin to be administered as provided by the terms of the treaty of 1854, and, in connection with which, *392 it was further provided that, upon the failure of said payment, all rights under said treaty were to be terminated. The treaty of 1860 gave the railroad company "a privilege in the purchase” or an option to purchase plaintiff’s surplus lands within a certain time — payment, if made, to be in coin. There was nothing in the treaty which imposed upon the railroad company a legal obligation to purchase these lands upon the treaty terms, or at all, and it does not appear from the record that the railroad company, prior to 1861, executed or made a promise to purchase these lands. No payment was made by the railroad, and on July 2, 1861, a second treaty was negotiated, executed, ratified, and proclaimed, 12 Stat. 1177, which, after referring to the former treaty of 1860, its requirements and the failure of the railroad company to make the necessary payment, by its provisions confirmed the orders of the President of the United States of June 10, 1861, and accepted his conclusion and direction that, in the interest of the plaintiff Indians and the railroad company, mortgage bonds of the railroad company of a prescribed form, and for the aggregate value given to the land, might be accepted as payment, and that “upon said bonds being so made and delivered, and said mortgage being so executed and duly recorded in Leavenworth County, Kansas, all matters, so far as not necessarily varied by this arrangement, shall proceed in conformity to the said treaty (I860), as if the money had been paid by the said railroad company and had been invested by the President in said railroad bonds.”
With reference to the first claim, it appears that in the treaty of September 24, 1829, supra, supplementing the treaty of October 3, 1818, 7 Stat. 188, in which this item had its origin, the provisions relating to the 36 sections of land set aside for sale to provide an educational fund required that the land should be “sold for the purpose of raising a fund to be applied, under the direction of the President, to support the schools for the education of the Delaware children.” There is no other or more definite provision concerning the character of the money to be received. None of the subsequent acts of Congress, or treaties, relative to the fund or its distribution, contained any recital as to the char *393 acter of the funds. The language used referred to “dollars” and there was no recital that payments for purchases were to be or had to be made in gold and silver. On February 25, 1862, the legal tender act became effective. The distributions in 1872, 1873, and 1875 were made after that dater and prior to the date of the resumption of specie payments on January 1, 1879. Assuming that such payments were made in legal-tender notes and that plaintiff’s accounts were charged on the basis of the payments made in legal tender, which fact is not established by the records, the legal tender dollar was authorized and required to be used under the legal tender act and the defendant was not precluded from using such currency under the terms of its financial engagements with the plaintiff tribe. Legal Tender cases, 12 Wall. 457.
With reference to the second and third claims, the treaty of 1854, 10 Stat. 1048, made no provision that payments for the lands should be in gold and silver, as contended by the plaintiff. Article I covered the cession of the plaintiff’s reservation to the United States for the purposes of sale. Article II obligated the defendant to “have the ceded country (excepting the said ‘outlet’) surveyed in the same manner that the public lands are surveyed,” and “so soon as the total or any portion of said lands are surveyed, proceed to offer such surveyed lands'for sale, at public auction,” or at private sale, and that the portion remaining unsold after three years “subject to private sale at the minimum price,” might be disposed of at a “reduced price.” The outlet was sold to the defendant for $10,000. Certain existing annuity payments due the plaintiff tribe were released under Article IV in lieu of an agreement that the defendant should pay them “the sum of $148,000,” to aid the plaintiff tribe in improvements on their farms.
Neither the provisions for payment of annuities, to the chiefs, Article VI, nor the provisions concerning the sale of the ceded lands, or the administration of the funds received from the sale, Article VII, contained any stipulation or requirements that the payments should be made in gold and silver coin, or that the defendant should be held accountable on that basis.
*394 There is some information in the record, in this case that the Secretary of the Interior in a letter indicated that the payments for sales made of plaintiff's lands in Kansas should be made in gold and silver coin, but the facts do not disclose and the record does not sustain the conclusion that all payments in each sale of land, or that any of them, were actually made in gold or silver coin. Neither the provisions of the treaty nor the statute required that payments be made in gold and silver coin and the letter does not determine the defendant’s accountability in gold in its accounting subsequent to the enactment of the legal tender act. The account shows that a very large proportion of the funds received from the sale of the Kansas land was invested in securities before the enactment of the legal tender act on February 25, 1862, and properly administered under the provisions of the treaty of 1854.
Finding VI shows that gold received as interest by the defendant upon plaintiff’s trust funds between February 1, 1862, and November 1, 1878, in gold, was promptly sold at the rate prevailing on the New York market at a profit of $56,953.05 and that the interest and premium received were placed to the credit of the plaintiff tribe.
With reference to the fourth claim, it appears that as a result of the inability of the railroad company to make payment within the time stipulated in the earlier treaty, the plaintiff tribe acquiesced in and subscribed to a new treaty providing for a different basis of payment for the railroad company for the lands acquired by it. This agreement was that railroad bonds instead of gold and silver coin were to be accepted in payment. These twenty-nine bonds, each for $10,000, were executed in May, 1861, and were payable in “dollars” which authorized their payment in legal tender currency.
It is of little consequence whether the defendant’s financial responsibility is to be tested by the exact provisions of the substituted treaty covering the sale of this land to the railroad company or whether, in viewing the plaintiff’s equitable rights from the standpoint of the entire transaction, it is necessary to read into the substituted treaty a requirement of gold bonds rather than bonds of a character which permit of their eventual discharge in the manner resorted to. Under *395 the administration and accounting phase of the treaty of 1854, with reference to such payments as were received in exchange for the sale of lands to the railroad, whether in gold and silver coin or dollar bonds of the company, the President, under Article VII, was authorized to invest the same in .safe and profitable stocks, and there was no other limitation upon the defendant’s authority and responsibility except that “the principal” thus invested should "remain unimpaired.” There is no claim that the principal has been impaired otherwise than that the account has been kept on the basis of' legal tender dollars.
Article VIII of the same treaty expressly, though unnecessarily, reserved to Congress the authority “at any time and from time to time, by law [to make] such rules and regulations in relation to the funds arising from the sale of the said lands, and the application thereof for the benefit and improvement of the Delaware people as may in the wisdom of that body seem just and proper.”
The enactment of the legal tender act of February 25, 1862, was such a rule and requirement, and an accounting for the same under its provisions constituted a full discharge of the defendant’s responsibility.
We are of opinion that the plaintiff is not entitled to recover upon any of the claims made. The rights of the plaintiff and the obligations of the defendant were contractual. The relationship of trustee and beneficiary was that provided for in Article VII in the treaty of May 6, 1854, supra, and was limited to the requirement that “the principal” should “remain unimpaired.”
The defendant was required to expend certain monies on behalf of the plaintiff, but, so far as concerned the medium of payment, this matter was always subject to the authority of Congress to regulate and to make appropriate provisions for the existence of money. The issuance of legal tender notes and their use by the defendant on behalf of the plaintiff was in no way an impairment of its obligation under the contract.
An additional reason why the plaintiff tribe can not recover is that the claims made are based upon a presumption which itself rests upon a presumption. There is no proof of the facts that the defendant was required to receive and to ac *396 -count to the plaintiff on any other than the basis of legal tender dollars; that it did or did not receive payment in gold and silver coin or that it did not, after February 25, 1862, convert such gold and silver coin as may have been received and was then held for the plaintiff’s account into legal tender notes at a profit and credit the plaintiff’s account with the same. The facts upon which the issue is submitted are in part silent in this regard and in part in conflict with the assumption. We can not assume the facts which are necessary to support the claims made by the plaintiff. United States v. Ross, 92 U. S. 281.
The record does not establish that the defendant, as trustee, has profited at the expense of the plaintiff tribe. It is not shown that the defendant has failed diligently to administer and fully to account for the full value of the plaintiff’s monies. There are no facts of record to support the contention that the defendant’s administration and accounting were otherwise than in accordance with the provisions of the various treaties out of which the plaintiff’s rights grew, or that its administration and accounting were not warranted and required by the provisions of the legal tender act of February 25, 1862.
The petition is therefore dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; QreeN, Judge; and Booth, Chief Justice, concur.