Booth, Chief Justice,
delivered the opinion of the court:
The special jurisdictional act of May 26, 1920 (41 Stat. 623), which refers this Indian case to the court, is found in finding I. One provision of the act is of vital importance in the decision of the case and will hereafter be quoted in full and discussed; it is not essential to set forth in this opinion the entire act.
The petition in this case was filed on May 23, 1925. Evidence on the part of the plaintiffs was not completed until July 25,1933'. The testimony of some fifty or more witnesses was taken by the parties during the years 1928, 1930, 1931, and 1932. The last report of the Treasury Department was filed August 15, 1932. The report of the General Accounting Office, involving a detail computation and examination of all expenditures and appropriations made for and on behalf of the plaintiffs from 1864 to 1920, was filed December 7,1933, a document voluminous and indispensable to the disposition of the case, made so by the right of the defendant to interpose a counterclaim, and one which cannot be unduly expedited.
On five different dates the court on its own motion placed this case upon the trial calendar for trial, and upon each date, except the last, a motion was made to remand the case to the general docket because not then Ready for trial, both parties conceding the fact. The case being finally briefed was placed on the May calendar and argued and submitted May 8, 1934. We recite these facts as demonstrative of the inherent difficulties which attend litigation of this character and illustrative of the factor of delay in their disposition. The case is one of importance, involving acute disputation as to certain facts hnd important legal questions.
The Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians claimed by occupancy an immense tract of land located in what are now known as the States of Oregon and California. March 25, 1864 (13 Stat. &7), Congress authorized the President to negotiate, and if possible conclude, a treaty with them. October 14, 1864 (16 Stat. 707), *89 a valid treaty was concluded, by the terms of which the plaintiff Indians ceded to the United States all of their lands theretofore claimed by them, except a defined and delimited tract of about 2,500,000 acres in the State of Oregon set aside to them as a reservation, known as the Klamath Indian Reservation and upon which they now reside.
On July 2,1864, about four months prior to the conclusion of the treaty of October 14, 1864, Congress had passed the donation act, found in 13 Stat. 355. This statute donated to the State of Oregon alternate sections of public lands, three sections in width, on each side of a proposed military road which the State intended to construct from Eugene City on its western boundary extending across the State to the eastern boundary thereof.
The State of Oregon accepted the grant as in aid of the construction of the road, and thereafter, on October 24, 1864 (18 Stat. 80), assigned to the Oregon Central Military Road Company all of the lands included in the grant, which company proceeded with the work of building the road, later, however, assigning and conveying to the California and Oregon Land Company all the rights and title to the lands involved, and this company completed the road. The United States in the years 1861, 1871, and 1873 issued to the road company patents for 402,240.67 acres of land covering the above donation.
Following the acquisition of title to the lands by the land company it was discovered that included within the acreage patented to it were 111-,400.08 acres of Indian lands; i. e., lands which were included under the treaty of October 14, 1864, within the Klamatl. Indian Reservation, belonged to the Indians and a substantial portion of which had been duly allotted to certain members of the tribe (34 Stat. 325). It had not been the intention of Congress to include within the donation of public lands any portion of the Klamath Indian Reservation, and when the mistake in so doing was discovered the United States set in motion exhaustive efforts to correct the error. Three suits were commenced by the United States against the land company in an effort to annul the patents to the Indian lands. This litigation, which extended over a long period of time and with respect *90 to which we need only cite the result, is found in the fol-loAving cases: United States v. Oregon Central Military Road Company, 140 U. S. 599; United States v. California and Oregon Land Company, 148 U. S. 31, and the final case involving the same parties, in 192 U. S. 355, wherein the title of the land company to all the lands included within the patents was confirmed and the issue put at rest.
The situation then in February 1904, as a result of the decision of the Supreme Court of that date, was that the Indians residing on the Klamath Reservation suffered a diminution of their reservation to the extent of 111,400.08 acres of land, and the allottees the loss of their allotments. Congress very promptly sought to rectify the error and injustice resultihg from the donation act of July 2, 1864, and on March 3, 1905 (33 Stat. 1033), passed an act directing the Secretary of the Interior to ascertain the value of the 111,-400.08 acres of Indian lands included within the donation act and discover for what price the California and Oregon Land Company would be willing to convey the same to the United States, or on what terms the land company would be willing to exchange the same for other unallotted lands within the reservation.
Eventually an exchange of lands was brought about, the land company conveying to the United States the 111,400.08 acres, thus restoring the same to the reservation and accepting in lieu thereof about 87,000 acres of unallotted and immensely valuable timberlands in another section of the reservation. This exchange was concluded on August 22, 1906, in accord with the provisions of the act of June 21, 1906 (34 Stat. 325, 368), and manifestly resulted in a diminution of the reservation to the extent of 87,000 acres of land. The act of June 21, 1906, supra, made no provision for the payment to the Indians for the taking of this tract of land.
On November 2, ,1907, the Secretary of the Interior transmitted to the Secretary of the Treasury the draft of a bill appropriating $108,750.00 as compensation to the Indians for the loss of the. 87,000 acres. On the same date the Secretary advised the Speaker of the House that the lands were “ certainly worth $1.25 per acre.” April 30, 1908 (35 Stat. 70, 92), Congress appropriated $108,750.00 to be paid the In *91 dians for the lands, a proviso to the act stating “ That this appropriation shall not be effective until said Indians, through the -usual channels, shall execute a release of any claims and demands of every kind against the United States for the land involved.”
In December 1908 the superintendent of the reservation assembled a council of the Indians at the general agency of the same. Ample notice of the council was given by deputizing the Indian police to proclaim the fact and by posting notices thereof. The Indian population of the reservation on this date was 1,038, of whom 640 were adults (287 males and 353' females). Some 200 or more Indians responded to the call and the superintendent in their presence explained the purpose of the meeting and what was essential for them to do if they wished to obtain the benefits of the appropriation. In addition to his address in English an Indian interpreter explained in their native tongue what the superintendent had said. Some opposition to signing the release appeared from a decided minority. The grievance uttered was not so much as to the inadequacy of the appropriation but was addressed to a fear that what was being done was not in accord with the wishes of the Department. At any rate, the one Indian as spokesman of the opposition finally signed the release, and it is certain that at least one hundred adult male Indians signed at this meeting.
The Klamath Reservation is in area extensive, and because of this fact a subagency had been established at the well-known place of Yainax on the reservation. The Indians residing at and near Yainax rarely visit or attend council meetings at the general agency some forty or fifty miles distant. The superintendent visited Yainax and before an assembly of Indians there repeated the procedure at the general aghncy, with the result that the release was eventually signed by 150 adult male Indians. It may be, although extremely doubtful, that some Indians were approached individually with respect to the matter. The Indian testimony so indicates, but the room for error in their testimony clearly demonstrates that they may be and probably are mistaken.
The superintendent certified to the Secretary of the Interior that the release had been executed, and the same was *92 thereafter approved by the Department. The appropriation being immediately available the same was credited on the books of the Treasury and expended for the benefit of the Indians, and they accepted without protest or complaint the items for which it was expended.
One claim now prosecuted under the jurisdictional act is for just compensation for the 87,000 acres of land taken in 1906. To sustain a cause of action and avoid the legal consequences of the release given, the plaintiffs contend that the following-provision of the jurisdictional act is in effect a waiver upon the part of the United States of a defense predicated upon the conclusiveness of the release and that the same may not be pleaded as an estoppel to the suit. The provision reads:
“ That if any claim or claims be submitted to said courts they shall settle the rights therein, both legal and equitable, of each and all the parties thereto notwithstanding the lapse of time or statutes of limitation, and any payment which may home been made upon any claim so submitted shall not be pleaded as an estoppel, but may be pleaded as an offset in such suits or actions, and the United States shall be allowed credit for all sums, including gratuities, heretofore paid or expended for the benefit of said Indians or any band thereof. * * * ” [Italics inserted.]
The concluding clause of the release of 1908 is as follows:
“ Now, therefore, the undersigned, being a majority of the Indians of the Klamath Reservation in council assembled, do hereby relinquish any and all claims and demands of every kind and character which they now have or may hereafter have against the United States for the lands involved.”
The plaintiffs obviously concede that, save for the alleged waiver of the same, the defense of estoppel was available to the United States. Many Indian cases are cited in the briefs. To review them separately would involve a repetition of familiar legal principles and a prolongation of this opinion to tedious length. The fundamental legal basis prescribed by the Supreme Court for the construction of special jurisdictional acts in Indian cases is concisely expressed in the Mille Lac Indian, case, 229 U. S. 498, 600, as follows:
“ The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for the adjudication of the claim *93 according to applicable legal principles. Nor does it contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give effect to their plain import, because of any supposed injustice to the Indians.”
In Price v. United States and Osage Indians, 114 U. S. 373, 375, the Supreme Court said:
“ The right of the plaintiff to recover is a purely statutory right. The jurisdiction of the Court of Claims cannot be enlarged by implication. It matters not what may seem to this court equitable, or what obligation we may deem ought to be assumed by the Government, or the Indian tribe, whose members were guilty of this depredation, we cannot go beyond the language of the statute and impose a liability which the Government has not declared its willingness to assume. It is useless to cite all the authorities, for they are many, upon the proposition. It is an axiom of our jurisprudence. The Government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it. See, among other cases, Schillinger v. United States, 155 U. S. 163, 166, in which this court said: ‘ The United States cannot be sued in their courts without their consent, and in granting such consent Congress has an absolute discretion to specify the cases and contingencies in which the liability of the Government is submitted to the courts for judicial determination. Beyond the letter of such consent the courts may not go, no matter how beneficial they may deem or in fact might be their possession of a larger jurisdiction over the liabilities of the Government.’ ”
Tribal Indians may-not sue the United States in this court except by special jurisdictional acts, and obviously all such litigation would be barren of results if the United States did not preclude the defense of the statute of limitations. In the Choctaw case, 19 C. Cls. 243, decided in 1881, Congress in the special act by words of indubitable meaning, i. e., “ Power is hereby granted the said court to review the entire question of differences de nono, and it shall not be estopped by any action had or award made by the Senate of the United States in pursuance of the treaty of eighteen hundred and fifty-five ”, waived the defense of estoppel which involved a previous award made to the Indians. Uni *94 formly the court’s jurisdiction has been limited to claims “ growing out of treaties, agreements, and acts of Congress.” The litigation has involved controversies with respect to the failure of the United States to observe treaty stipulations, discharge contractual obligations, and comply with the provisions of acts of Congress.
A review of the many cases decided by this court discloses, we think, that when Congress intends to waive a defense it Las left no room to doubt the intention. While it is true that special jurisdictional acts in Indian cases extend to the point of extreme liberality as to the subject- matter to be adjudicated and involve large sums of money, nevertheless the court is not by implication to extend the scope of the act if in its opinion the language of the same does not warrant the construction. When Congress intends, as the cases indicate, to waive the effect of settlements and awards, apt language is used to accomplish the purpose. Delaware cases, 72 C. Cls. 483; Id. 525; 74 C. Cls. 368.
A precedent long ago established inhibits this court under special jurisdictional acts from adjudicating any Indian claims depending for their validity upon the setting aside or abrogation of any article of a treaty. United States v. Weld, 127 U. S. 51; Old Settlers case, 148 U. S. 427; Lone Wolf v. Hitchcock, 187 U. S. 553. Plaintiffs’ contention embraces the necessity of setting aside a referendum settlement and trying the entire issue de novo-. Congress was unwilling to consummate the payment until the Indians by a majority of the male adults had signified their satisfaction therewith, and the language of the appropriation act clearly and unmistakably discloses that it was to be not only a satisfactory but a final settlement for the lands taken. To revive a liability once satisfied and expressly released exacts language in the act which leaves no room for doubt, and especially is this true when the contemporaneous policy of the United States was to effect, if possible, conclusive agreements with the Indians in making settlements.
Assuredly this clause of the special act is not meaningless. Congress in inserting it intended some remedial purpose. Payment upon a claim may be made without exacting a written release of the same, and when made may raise the *95 issue as to whether it extinguishes the liability involved or was only a partial one. Indian controversies under special jurisdictional acts universally involve an alleged failure to accord the Indians what treaties, agreements, and acts of Congress gave to them, and the instances are many where the cause of action involves payments made.
A settlement and release of a claim is something different in law from a “ payment upon a claim.” A release of a claim results in a legal relationship of the parties distinct from a payment upon or of a claim without signing a release. In many instances the Department of the Interior either disburses money to the Indians or deposits same in the Treasury to their credit, acting upon a settled conviction that by so doing they are discharging in full the liability of the United States under treaties, agreements, and acts of Congress, and the disbursements so made are accepted by the Indians and acquiesced in for a long period of time.
Subsequently a controversy arises as to whether the payments made as above, although accepted and acquiesced in as in full, were in fact and in truth sufficient in amount under the documents setting out the liabilities to discharge the same. Suits involving issues of this precise character are numerous in this court. One generation of Indians accepts payments without complaint; a succeeding one challenges them as not being in full. This, we think, is, as before observed, quite different from a transaction where the parties meet in council, discuss and determine a claim, and in accord with the congressional act offering the settlement accept the same and release the United States from all further or additional liability for the same. In one instance the act of payment emanates from an administrative officer of the United States; in the other it is the solemn proceedings of the parties themselves, and discharges an assumed liability.
Therefore it seems to us that what Congress intended by a waiver of the defense of estoppel predicated upon payments made upon a olcrnn, was not to preclude the United States from proving that a payment made discharged the liability. To establish this fact the burden was put upon the defense, and the fact of payment did not relieve the *96 issue from proof upon the merits. It, we think, did not refer to a settlement, an extinguished liability, but to an outstanding claim.
In this case we have not only a payment made and accepted, but a written release, comprehensive in terms, which was intended to and did extinguish any existing liability. No future claim could be based upon the transaction unless Congress waived the legal effect thereof. The issue here is not alone one of payment working an estoppel, but the setting aside of a release which admittedly closed the transaction and extinguished all liability under the claim. If Congress intended to nullify a release it would have used language clearly evidencing that intention. In the choice of legal terms we cannot assume that Congress intended to set aside a release by using the words “ payment upon a claim.” Judicial precedents, quite familiar, limit the court in construing special jurisdictional acts to “ the plain letter of the law conferring jurisdiction.” In the Blackfeather case, 190 U. S. 368, 316, the Supreme Court said:
“As these statutes extend the jurisdiction of the Court of Claims and permit the Government to be sued for causes of action therein referred to, the grant of jurisdiction must be shown clearly to cover the case before us, and if it do not, it will not be implied. Statutes of this nature extending the right to sue the Government will generally be strictly construed.”
See also the Osage case, 114 U. S. 313, and Ohoetam Nation case, 119 U. S. 494.
While not conclusive, another fact disclosing the extent to which Congress was willing to go in conferring jurisdiction upon this court in this case, as well as the subject matters before that body, is evidenced by the report of the House Committee in charge of the same, a report also adopted by the Senate Committee. In these reports this claim is not mentioned by the committees, and, what is more, an extended memorial of the Indians setting forth their claims against the United States and praying for a special act to enable their prosecution makes no reference nor mention whatever of a claim for compensation for the 81,000 acres of land involved in this case.
*97 In addition to what has been said, the opinions of this court in the Creek Nation cases, 63 C. Cls. 270; 77 C. Cls. 226, as well as in tlie Delaware Iridian cases, supra, with respect to construing special jurisdictional acts in-Indian cases, are apropos. The court, without quoting the language, held that only such claims as grow out of treaties, agreements, or acts of Congress, come within the jurisdiction conferred, and that the acts did not confer authority to abrogate a treaty, set aside its articles and award judgment accordingly, because obviously a claim could not grow out of a treaty if its origin were founded upon an abrogation of the treaty itself. In the Delaware cases Congress, in language which could not be misunderstood, conferred jurisdiction “to consider all such claims de novo.” The claim in suit does not grow out of an agreement; it can only obtain validity by setting aside a release, a settlement.
In answer to the above the plaintiffs state: “ The claim sued upon is not presented as a claim arising under any treaty or agreement but as one in the broad category of ‘ claims of whatsoever nature which ■ the Klamath and Moadac Tribes of Indians * * * may have against the United States * * * for the failure of the United States to pay said Indians any money or other property due ’, i. e., money due them as just compensation for the taking of the 87,000 acres.” The quotation from the jurisdictional act is not complete. The act recites in addition to the above that our jurisdiction shall extend to the “ determination of the amount, if an'y, due said Indians from the United States under any treaties, agreements, or laws of Congress.” ' It was a law of Congress which effected the transfer of the 87,000 acres of reservation lands, and it was another law of Congress which effected the settlement therefor. Congress, and Congress alone, possessed the authority to do what was done, and Congress was the only source from which the Indians could upon terms imposed receive compensation. Save for acts of Congress this claim would not have arisen. Lone Wolf v. Hitchcock, supra.
The plaintiffs challenge the validity of the release. The record, it is said, sustains the charge that it was not obtained *98 “ through the usual channels ” observed by the Indians in considering matters of this sort, and that signature thereto were obtained by duress. In addition to this, it is asserted with much confidence that the Indians possessed no knowledge as to the real value of the lands and were ignorant of the provisions of the release, which were not intelligently explained to them and in any event it was not signed by a majority of the Indians because the women present at the council were not allowed to participate in or sign the same.
From time immemorial the tribal Indians assembled in council. Sometimes the assembly was for the purpose of observing Indian customs and practices in a spirit of celebration ; at other times it was for the consideration of tribal affairs, and not infrequently business and celebration were combined. The Indians on the Klamath Reservation met in councils. They were called together in some instances upon their own motion, and upon other occasions by the superintendent- of the agency. The United States in negotiating treaties assembled councils, and the statutes of the United States disclose repeated acts of Congress referred for ratification to Indian councils. In later times the Indian council has developed into more settled and established forms of procedure, and the United States in the matter of legislation affecting Indian lands and funds has proceeded largely upon the rule of obtaining the assent of the Indians to the legislation enacted. The purpose of so doing is apparent. To withhold from the Indians an opportunity of knowing and expressing their approval or disapproval of the legislation was not intended.
Some fifty Indian witnesses were examined by the plaintiffs. Without exception, they testify that no chairman or secretary of the council held on December 5, 1908, was elected; no proposition was put to a vote by the presiding officer; and that the superintendent of the agency as presiding officer not only did not allow the women present to participate in the meeting but stated to the Indians, in substance, “ that if they did not accept the $108,750.00 and execute the release in question they would lose both the land *99 and money — they would get nothing.” The release, it is said, was not at this meeting signed by a majority of the Indians present, but signatures thereto were procured by. circulating it among individual Indians and soliciting their signatures, many of whom signed without knowing what they were doing.
The burden of proof with respect to duress and misrepresentation proffered to invalidate an instrument under seal is upon the plaintiffs, and when signatories to such a document some nineteen or twenty years later testify with unanimity, and at a time when the prospects of a large judgment appear, that coercion and misrepresentation obtained to procure their signatures, the record thus made loses much if not all of its probative force and falls far short of reaching that degree of proof essential to establish the charges made. Especially is this true when the release upon its face discloses that some seventy-four Indians signing the same did so by “ thumb mark ”, and most if not all of the same Indians called as witnesses in this case disclose no advancement in their ability to read or write English.
The failure to observe the details of procedure previously followed by the Indians in conducting a council is not fatal. The predominant questions are, first, was the subject matter to be discussed fully and fairly presented to the assembly; and, second, did the Indians understand and know what they were doing? The Superintendent called the council in the usual way. He presided and presented the question of the payment of the money and the release fully and fairly. An interpreter selected by him explained the matter in their native tongue; that he did not resort to any unlawful practice to secure the assent of the Indians is manifest from the fact that he himself was not in sympathy with but opposed to the terms of the settlement. All he did, as he says, was to discharge his duty, and what he said to the Indians was in keeping with the proceedings. Each Indian witness produced by the plaintiffs concedes that knowledge of the fact that they were to receive the amount offered by the United States, in payment for the 81,000 acres taken, obtained. The *100 gist of tlieir evidence centers upon the fact that they relied i¡pon the fairness of the United States to pay what the lands were worth to them, and acted without knowledge of the true value of the same, believing that failure to assent meant a loss of the money and the lands as well.
It is indeed an involved and perplexing problem to analyze a record of oral testimony such as we have here, a record which in practically all instances is incapable of contradiction from any other source than documentary evidence, and hold that because of the differences in experience, learning, congenital habits, and customs between the parties to the transaction, the volume of corroborated oral testimony is sufficient to overcome what positive and contemporary permanent records in writing disclose. At any rate, the method which Congress chose to adopt in consummating this transaction, as evidenced by the legislation, bears the seal of congressional approval as one adopted to procure a fair, deliberate, and mutual settlement of the controversy. It is, of course, difficult to hold that each Indian signing the release knew precisely what he was doing; that many of them did is evident. Nevertheless, this court, as repeatedly held, is restricted to the rules of law and equity in adjudicating the case, and to the facts we are bound to apply the same. We think, as our findings show, that duress and misrepresentation in procuring the release are not sustained.
We have made the findings after a careful analysis of the record, but inasmuch as in our opinion the special jurisdictional act does not confer upon the court authority to determine the claim, we do not discuss the same. The petition will be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; LittletoN, Judge; and GREEN, Judge, concur.